**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| United States of America, | **No. CR-24-06035-TUC-AMM (EJM)** |
|---|---|
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Samuel Lopez-Ozuna, | |
| Defendant. | |

Pending before the Court is Defendant's Motion to Determine Competency (Doc. 64.) Counsel for Lopez-Ozuna argue that he is not competent to stand trial because his severe cognitive deficits revealed by neuropsychological testing prevent him from understanding the proceedings against him and assisting in his defense. (*See* Hr'g Tr. 3/11/2025 (Doc. 118) at 19–37.)[1] The government argues that the defendant's cognitive deficits are not so severe that he cannot meet the legal test for competency because he demonstrated during the competency evaluations that he understands his rights, legal concepts, and the key players in the courtroom; he recalls pertinent facts that led to his arrest; and he has the ability to assist counsel in his defense. (*See id.* at 8–19, 37–45.) For the reasons discussed below, the Court recommends that the District Court find that Lopez-Ozuna is competent to stand trial.

## I.    FACTUAL BACKGROUND

The defendant is charged in an Indictment dated September 11, 2024, with the

---

[1] Page citations for this transcript refer to the Case Management/Electronic Case Filing ("CM/ECF") pagination reflected in the Court's docket.

following offenses:  Conspiracy to Transport Illegal Aliens for Profit and Placing in Jeopardy the Life of Any Person Resulting in Death (Count One); Transportation of Illegal Aliens for Profit Resulting in Death (Count Two); and Transportation of Illegal Aliens for Profit Placing in Jeopardy the Life of Any Person [Resulting in Death] (Counts Three through Eight).  (*See* Indictment (Doc. 39).)   The video depositions of six material witnesses were initially delayed (well beyond the normal 30-day time limit) for the following reasons: (1) resolution of whether the government would seek the death penalty; (2) the voluminous amount of disclosure; and (3) the delay in the government providing defense counsel with some of that disclosure.  (*See, e.g.*, Minute Entry 10/2/2024 (Doc. 49).)

At a status hearing on October 2, 2024, defense counsel first raised their concern about the defendant's competency and the need to potentially continue the video depositions for that reason.  (*See* Minute Entry 10/2/2024 (Doc. 49).)  Defense counsel retained Dr. Jennifer Weller to conduct a competency evaluation of Lopez-Ozuna.  (*See* Minute Entry 11/13/2024 (Doc. 63).)  Defense counsel subsequently advised the Court and government counsel that Dr. Weller had concluded that Lopez-Ozuna was not competent and that her report would be forthcoming.  (*See id*.)  Defense counsel later advised that even though Dr. Weller's opinion would not change, she wanted to have additional meetings with Lopez-Ozuna and perform neurocognitive testing prior to issuing her report.  (*See id*.)  At the November 13, 2024, status hearing, the Court inquired regarding the government's willingness to stipulate to Dr. Weller's opinion that Lopez-Ozuna is incompetent and make a motion that he be sent to a Bureau of Prisons facility for restoration.  (*See id*.)   The government refused to stipulate that the defendant was incompetent.  (*See id*.)

On November 19, 2024 the government filed a motion asking the Court to appoint a mental health professional to conduct a competency evaluation.  (*See* Govt.'s Mot. for Competency (Doc. 64).)  On November 21, 2024, the Court granted the government's motion and appointed Dr. Bradley Johnson to conduct the evaluation.  (*See* Order

11/21/2024 (Doc. 65).)

Dr. Johnson prepared a report dated January 8, 2025 in which he opined that the defendant was competent to stand trial. (*See* Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78); *see also* Hr'g 3/4/2025 Def.'s Ex. List (Doc. 107), Def.'s Ex. 52—Dr. Johnson's Competency Eval. 1/08/2025.) Dr. Weller prepared a report dated February 13, 2025, in which she opined that the defendant was not competent. (*See* Hr'g 3/4/2025 Def.'s Ex. List (Doc. 107), Def.'s Ex. 55—Dr. Weller's Psych. Eval. 2/13/2025.)[2] The Court turns to a discussion of these reports.

**A. Dr. Bradley Johnson's Report**

Dr. Johnson conducted his competency evaluation of Lopez-Ozuna on December 23, 2024. (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 1; *see also* Hr'g 3/4/2025 Def.'s Ex. List (Doc. 107), Def.'s Ex. 52—Dr. Johnson's Competency Eval. 1/08/2025 at 1.) In addition to conducting a forensic interview of Lopez-Ozuna, Dr. Johnson reviewed the following sources of collateral information: the indictment; investigative reports; an audio recording with Lopez-Ozuna from August 11, 2024; and a letter from Dr. Jennifer Weller dated November 25, 2024, which attached raw test data. (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 1.) The interview of Lopez-Ozuna occurred in Dr. Johnson's office and lasted for ninety (90) minutes. (*Id*.) Lopez-Ozuna indicated that he understood that a report of the evaluation would be submitted to the court, and that it would not be considered confidential. (*Id.*) He agreed to participate in the interview. (*Id.*)

Lopez-Ozuna provided an account of his personal history which included that: he has been incarcerated at CCA since August 2024; he had been living with his 42-year-old mother before his incarceration; his parents separated when he was six (6) or seven (7), and he never knew his father; he has two sisters and a half-brother on his mother's side of

---

[2] Throughout the remainder of this Order, this citation shall be shortened to Dr. Weller's Psych. Eval. 2/13/2025. As the long citation reflects, Dr. Weller's evaluation was admitted as Exhibit 55 during the March 4, 2025, Evidentiary Hearing, but is not filed in the docket.

the family; and has three half-siblings on his father's side of the family.  (*Id.*)

Dr. Johnson noted that he was not provided with Lopez-Ozuna's educational records.  (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 1.)  Lopez-Ozuna reported the following about his educational history: he attended school through the twelfth grade but did not graduate high school; he was about a year behind in his credits when he dropped out of school; he never graduated because he hung out with the wrong crowd and often missed school; he received average to below average grades; he was in special education for English as a second language from around kindergarten to the fifth grade; and he did not receive special education services for behavior or learning disabilities.  (*Id.*)

With respect to his employment history, Mr. Lopez-Ozuna reported that he worked at a pizza restaurant a year-and-a-half from the ages of sixteen (16) to seventeen (17), and then at another pizza restaurant for about three months at age of eighteen (18).  (*Id.* at 2.)  He then did some construction work for a couple of months prior to his arrest.  (*Id.*)

Dr. Johnson noted that he was not provided with medical records.  (*Id.*)  Lopez-Ozuna reported the following about his medical history: he had a motor vehicle accident the day of his arrest which resulted in physical injuries and a surgery; he lost consciousness for several hours, possibly overnight; he has no recollection of the accident; and he believes that he regained consciousness in the hospital.  (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 2.)  Lopez-Ozuna reported struggling with somewhat slower thinking and possible difficulty with memory since the accident.  (*Id.*)  He also reported being in a head-on collision in 2023, where he cut the front of his head and believes that he lost consciousness for a few seconds.  (*Id.*)  Lopez-Ozuna denied having any other head injuries that led to a loss of consciousness.  (*Id.*)

With respect to his psychiatric history, Lopez-Ozuna denied feeling depressed but in October 2024 he was placed on suicide watch at CCA for ten (10) days because he told medical staff that he was depressed and wished he was dead.  (*Id.*)  However, he reported that he did not have a plan or intent to kill himself and has never attempted suicide.  (Dr.

Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 2.)  Lopez-Ozuna reported that his mental health has improved and he sleeps well (approximately eight (8) hours a night).  (*Id.*)  He has a somewhat low energy level due to his ongoing pain, and his self-esteem is neither low nor very high.  (*Id.*)  He admitted that he has a long history of problems with concentration but denied that his concentration level has changed recently.  (*Id.*)  He has been somewhat anxious and worried about his family and what will happen to him because of his current charges.  (*Id.*)  He denied having anxiety before being incarcerated; however, he admitted to having occasional panic attacks.  (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 2.)  Lopez-Ozuna denied symptoms consistent with mania or paranoia and denied experiencing any auditory or visual hallucinations.  (*Id.* at 3.)

Lopez-Ozuna said he struggled with concentration and focus when he was younger, and had problems with distractibility and would get off task.  (*Id.*)  Lopez-Ozuna also said that he was generally organized and would remember to turn in school assignments, as well as get the school supplies that he needed.  (*Id.*)  Lopez-Ozuna acknowledged that it often took longer than normal to get his homework done, and he occasionally felt behind in school.  (*Id.*).  He was somewhat hyperactive, impulsive, and a "show-off" as a youngster.  (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 3.)  Lopez-Ozuna still struggles with focus and concentration but is not hyperactive.  (*Id.*)

Lopez-Ozuna reported the following about his alcohol and substance abuse history: he began to drink alcohol at age sixteen (16) or seventeen (17) and now drinks up to a bottle of "dark liquor" per day; he began using marijuana at age fourteen (14) and has been using it daily since then, including the day of his arrest; he has been sniffing cocaine a few times a day since age seventeen (17) and did so the day before his arrest; and he has tried LSD a couple of times.  (*Id.*)

Dr. Johnson noted that he believes that Lopez-Ozuna is aware of the pending charges.  (*Id.*)  Lopez-Ozuna described his version of the events that led to his arrest and went into a fair amount of detail as to what occurred up to the accident.  (*Id.*)  Although he

claimed not to have a memory of what occurred after the accident until he awoke in the hospital, he is aware of what is alleged to have occurred.  (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 3.)

Dr. Johnson noted that he believes that Lopez-Ozuna understands the adversarial nature of a court proceeding.  (*Id*.)  Lopez-Ozuna provided the name of his defense attorney; he said it is her job to help him on his case; he has spoken with her, trusts her, and believes she is able to help him on his case.  (*Id.*)  He knows that the prosecutor works for the government and will try to prove that he is guilty.  (*Id.*)  He said the jury is a group of people in court who listen to both sides presented and then decide whether a person is guilty or not guilty based on what is presented.  (*Id.*at 3–4.)  He knows that a judge would decide the sentence and that a judge could decide guilt or innocence in a bench trial.  (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 4.)  Lopez-Ozuna believes that if he is found guilty, he could spend the rest of his life in prison.  (*Id*.)  He said that he had been offered a plea agreement and explained that a plea is when one admits guilt to a lower charge or a lower number of charges in order to receive less time.  (*Id.*)  He knew that if a person pleaded guilty, they would not have a trial.  (*Id.*)

Dr. Johnson noted that he believes that Lopez-Ozuna understands his legal rights.  (*Id.* at 6.)  Lopez-Ozuna said that he had the right to "stay quiet" and then described the right to remain silent.  (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 4.)  He knew he did not have to talk to the police.  (*Id.*)  Lopez-Ozuna then said that he could not recall any other rights.  (*Id*.)  When Dr. Johnson brought up the right to an attorney, Lopez-Ozuna cut him off and said he had simply forgotten that right but knew it.  (*Id.*)  Lopez-Ozuna did not bring up the right to a fair trial, but understood it without difficulty after education.  (*Id.*)  He was unsure if he could receive a fair trial because of the charges; however, Dr. Johnson noted that there were not mental health issues that affected his belief that would not have a fair trial.  (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 4.)

With respect to behavior in the courtroom, Lopez-Ozuna said he was supposed to

sit down, remain silent and not interrupt anyone.  (*Id.*)  He described a witness as someone who may have seen what happened.  (*Id*.)  He said he would inform his attorney if he believed that a witness was lying.  (*Id.*)

Dr. Johnson described Lopez-Ozuna as somewhat anxious, but noted that he did not appear depressed, guarded or paranoid.  (*Id.*)  Lopez-Ozuna's thought content was unremarkable; his thought associations were logical, but his thinking processes were mildly concrete.  (Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 4.) Lopez-Ozuna did not suffer from hallucinations or delusional thinking, and did not demonstrate loose thought associations, or tangential or circumstantial thinking.  (*Id.*)

Dr. Johnson reported that Lopez-Ozuna's concentration was at least fair.  (*Id*.)  He had occasional difficulty with his memory, but this was not extreme.  (*Id.*)  Although intelligence testing was not performed during the evaluation, Lopez-Ozuna did not come across as having significantly below average intelligence.  (*Id.*)  His judgment and insight were at least fair, if not good.  (Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 4.)

Dr. Johnson diagnosed Lopez-Ozuna with the following conditions: Adjustment Disorder with Anxiety; Alcohol Use Disorder (in remission because incarcerated); Cannabis Use Disorder (in remission because incarcerated); Stimulant Use Disorder (cocaine) (in remission because incarcerated); Rule Out Attention-Deficit/Hyperactivity Disorder; and History of Head Trauma.  (*Id*. at 5.)  Notwithstanding these issues, Dr. Johnson's opined that Lopez-Ozuna is competent to stand trial because he demonstrates the ability to rationally assist his attorneys in preparing his defense and a rational and factual understanding of the workings of the court and the key players in the courtroom. (*Id.*)

Dr. Johnson noted Dr. Weller's concern that Lopez-Ozuna may show signs of neurodevelopmental disorders based on the following: below average receptive and expressive vocabulary scores; some weakness in attention and semantic fluency; very slow processing speed; delay in responding to questions; the need to repeat questions; his

1    uncertainty about basic legal questions; and cognitive and physical fatigue after two hours

2    of evaluation.  (*Id.*)  Although Lopez-Ozuna had some minor memory issues, Dr. Johnson

3    found his overall ability to answer questions reasonable.  (*Id.* at 6.)  He also understood

4    legal concepts, and for those that he did not know or remember, he recalled them quickly

5    once reminded, and grasped them without difficulty once educated.  (Dr. Johnson's

6    Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 6.)  Dr. Johnson

7    acknowledged that Lopez-Ozuna may need to take breaks at times or have questions

8    repeated; however, in Dr. Johnson's opinion that does not prevent him from being

9    considered competent to stand trial.  (*Id.*)

10   **B. Dr. Jennifer Weller's Report**

11       Dr. Weller authored a report dated February 13, 2025 which detailed her evaluation,

12   findings, and conclusion that Lopez-Ozuna is not presently competent to stand trial.  (Hr'g

13   3/4/2025 Def.'s Ex. List (Doc. 107), Def.'s Ex. 55—Dr. Jennifer Weller's Psych. Eval.

14   2/13/2025 at 1.)[3]  Dr. Weller met with Lopez-Ozuna at CoreCivic on the following dates:

15   October 31, 2024; November 7, 2024; January 9, 2025; and January 16, 2025. (*Id.*)  Lopez-

16   Ozuna was initially evaluated for competency on October 31, 2024 and November 7, 2024.

17   (*Id.*)  After a discussion with defense counsel on November 8, 2024, about Lopez-Ozuna's

18   suspected cognitive issues, counsel requested a neuropsychological evaluation, which was

19   conducted on January 7, 2025 and January 16, 2025.  (*Id.*)

20       Dr. Weller spent almost twelve hours meeting with Lopez-Ozuna.    (*Id.*)

21   Approximately seven (7) hours of the total time were dedicated to neurological testing.

22   (Dr. Weller's Psych. Eval. 2/13/2025 at 1.)  Dr. Weller was provided with and reviewed the

23   following collateral information: the state and federal indictments; state court criminal

24   records; an audio recording of an interview with the defendant from August 11, 2024;

25   Banner University medical records (dated June 7, 2023 and August 9, 2024 to August 14,

26

27   ─────────────────

28   [3] Throughout the remainder of this Order, this citation shall be shortened to Dr. Weller's
     Psych. Eval. 2/13/2025.  As the long citation reflects, Dr. Weller's evaluation was admitted as
     Exhibit 55 during the March 4, 2025, Evidentiary Hearing, but is not filed in the docket.

2024); Valencia Chiropractic records; SPARCC Sports Medicine records; CoreCivic Medical and Mental Health records (dated August 9, 2024 to November 2, 2024); Tucson Unified School District records; Cragin Elementary School records; and Pima Rose Academy records. (*Id.* at 2.)

With respect to behavioral observations of Lopez-Ozuna, Dr. Weller noted: he did not ask for any information to be repeated; no pronunciation or articulation issues were detected; his speech was clear and easy to understand; there were no signs of physical distress (although he reported back pain); no signs of mental illness were reported or observed; his presentation and demeanor was consistent or slightly younger than his age; and he seemed to have some insight into the seriousness of his legal situation but had difficulties understanding many of the nuances of his case. (*Id.* at 3.) Lopez-Ozuna reported being on Mental Health Watch a week prior to the October 31, 2024 meeting because he was feeling depressed; but he denied feeling suicidal. (*Id.*)

### 1. October 31, 2024 meeting

Dr. Weller described how Lopez-Ozuna presented at the October 31, 2024, meeting: he was stable and dysthymic; he did not appear anxious or show signs of strong emotion; his thought processes were mostly coherent, goal directed, logical, and linear; he did not get stuck on specific topics of discussion; his speech was normal; his thoughts were reality-based, and he never appeared to respond to internal stimuli and was not overly distracted; he was oriented to person, place, date, and time; he was polite, cooperative, and rapport was easily established; and he appeared fatigued at the outset of the visit. (Dr. Weller's Psych. Eval. 2/13/2025 at 3.) Dr. Weller noted that as the visit progressed, Lopez-Ozuna showed increased latency of response to questions, and after two hours, he had difficulty attending to questions. (*Id.*) He was provided short breaks, but Dr. Weller ended the meeting early due to problems with stamina. (*Id.*)

Dr. Weller made the following preliminary comments about her interactions with and testing conducted on Lopez-Ozuna: scored fifty-eight (58) out of sixty-one (61) on the Inventory of Legal Knowledge test, which showed that he did exaggerate or malinger his

cognitive deficits or misrepresent his legal knowledge; he almost always provided short responses to questions pertaining to competency to stand trial and never elaborated spontaneously on his responses; when prompted to elaborate, his responses were incomplete or lacked sufficient detail; and many questions had to be repeated or rephrased in a manner to account for his comprehension difficulties, as well as his limited vocabulary and cognitive stamina.  (*Id*. at 5–6.)

During their October 31, 2024, meeting, Lopez-Ozuna and Dr. Weller discussed his understanding of the charges against him, and he recounted the state and federal charges. (*Id*. at 6.)  Lopez-Ozuna knew that the charges were felonies and that a felony is more serious than a misdemeanor. (Dr. Weller's Psych. Eval. 2/13/2025 at 6.)  He also said that the charges against him were very serious because one person died. (*Id.*)

When asked about his basic rights, he appeared confused.  (*Id.*)  Dr. Weller asked what police officers said at the time of arrest; Lopez-Ozuna said a person has the right to remain silent and anything you say can be used against you.  (*Id.*)  When Lopez-Ozuna said that he did not know any other rights, Dr. Weller provided education about each of the rights and asked him to explain them.  (*Id.*)  He again identified the right to remain silent and said, "that you have the right not to speak to them until you get a lawyer." (Dr. Weller's Psych. Eval. 2/13/2025 at 6.)  When asked why this right was important, Lopez-Ozuna said, "Because anything you tell them can mess up your case."  (*Id.*)  When asked what it meant that "anything you say can be used against you in a court of law[,]" he said, "If you tell them something you were not supposed to, they can use it against you."  (*Id.*)  When asked why it was important for someone to know that a statement can be used against you, Lopez-Ozuna said, "Cuz it could go against you."  (*Id.*)  Dr. Weller noted that he could not elaborate further.  (*Id.*)  When asked what a lawyer was supposed to do to help someone, Lopez-Ozuna said, "help you with your case."  (Dr. Weller's Psych. Eval. 2/13/2025 at 6.) When asked the importance of a person being provided with a lawyer if they cannot pay for one, he said, "So that they could speak to their lawyer first instead of telling the cops the wrong thing."  (*Id.*)  When later asked the same question, Lopez-Ozuna said, "Because

they still need a lawyer for court." (*Id.* at 7.) Dr. Weller noted that he could not provide specifics and also could not explain why a right to a trial was important. (*Id.*)

Dr. Weller asked Lopez-Ozuna what it meant to be competent to stand trial. (*Id.*) He responded, "To make sure I understand everything." (Dr. Weller's Psych. Eval. 2/13/2025 at 7.) When asked why his lawyers wanted to know if he was competent, he asked, "[B]ecause of my head injuries?" (*Id.*) When asked how he felt about his lawyers wanting to know about his competency, he said, "[T]hey know what they are doing." (*Id.*) When asked why he believed that, he responded, "The way I see them work, and talk, and how they do stuff, and what they tell me." (*Id.*)

Lopez-Ozuna could not explain what it means that a person has a right to a trial and said that he does not know what goes on at a trial. (*Id.*) Education was provided. (Dr. Weller's Psych. Eval. 2/13/2025 at 7.) When asked if he could stay focused at a trial, he shrugged; Dr. Weller then asked why it might be difficult and he said, "Cuz I don't understand it." (*Id.*)

Lopez-Ozuna said a person can plead guilty or not guilty. (*Id.* at 8.) Lopez-Ozuna described "guilty" to mean "you are taking responsibility for the crime[,]" and "not guilty" to mean "trying to prove that you're innocent." (*Id.*) He did not know the concepts of "no contest" or "guilty except insane" pleas. (*Id.*) Dr. Weller provided education about those pleas; when later asked about the four types of pleas Lopez-Ozuna said guilty or not guilty and that he forgot the other two. (Dr. Weller's Psych. Eval. 2/13/2025 at 8.)

Lopez-Ozuna described a plea bargain as "see[ing] how much time they'll give you." (*Id.*) After education was provided, he said he could not explain it. (*Id.*) Lopez-Ozuna was not sure what right he would be giving up if he took a plea bargain. (*Id.*) When asked the advantages of a plea bargain or pleading guilty, he responded, "Lower sentence? I'm not sure." (*Id.*) As to the disadvantages, he said: "still have to do all that time" and "admitting that you did the crime." (Dr. Weller's Psych. Eval. 2/13/2025 at 8.) Dr. Weller noted that he was not sure of the disadvantages of pleading not guilty, initially or after education was provided. (*Id.*)

When asked what possible sentence he could receive, he said "I don't know yet." (*Id.* at 9.) He knew that if he was found guilty, he would serve his sentence in a prison. (*Id.*) Lopez-Ozuna also knew that if someone was guilty but insane they would be sent to a mental hospital. (*Id.*) With respect to the concept of probation, Lopez-Ozuna explained that "you could be out, but you'll still be watched by a probation officer." (Dr. Weller's Psych. Eval. 2/13/2025 at 9.) As to possible conditions of probation, he said: curfew; house arrest; no smoking, drinking or drugs; maybe can't drive; and have a job. (*Id.*)

Lopez-Ozuna said the job of a defense attorney was "[t]o help you against your case." (*Id.*) When asked for examples of how a defense attorney "helps," he said he was not sure. (*Id.*) After education was provided and he was asked the same question, he said, "To help you." (*Id.*) With respect to the role of a prosecutor, he said, "I think they try to get evidence against me." (Dr. Weller's Psych. Eval. 2/13/2025 at 9.) If a prosecutor asked him questions outside of the courtroom, Lopez-Ozuna said that he should "not answer them." (*Id.* at 10.) When asked why, he said, "Cuz they could try to trick me with trick questions, they could use it against me." (*Id.*)

When asked the role of a judge, Lopez-Ozuna responded, "To sentence you?" (*Id.*) Dr. Weller noted that Lopez-Ozuna could not provide any other information on this topic, but he knew that the court had authority over him. (*Id.*) Lopez-Ozuna also said he did not know the difference between a jury trial and a bench trial. (Dr. Weller's Psych. Eval. 2/13/2025 at 10.) Lopez-Ozuna said he did not know the role of the jury or where members of the jury came from. (*Id.*) When asked who in the courtroom decides guilt, he responded, "The jury?" (*Id.*)

Lopez-Ozuna knew that a witness was "someone . . . that seen the crime happen," and would testify in the courtroom about "what happened." (*Id.*) He knew that a witness could help someone's case, but he could not give examples or elaborate how a witness could do so. (*Id.*) After education was provided, Lopez-Ozuna knew that a witness could harm someone's case by "telling everyone what happened," but he could not provide examples. (Dr. Weller's Psych. Eval. 2/13/2025 at 10.)

Lopez-Ozuna knew he was the defendant, but did not know the definition of a defendant. (*Id.*) He knew that defendants do not have to testify. (*Id.*) When asked what amendment a defendant would be using, he responded, "To remain silent?" (*Id.*) After education was provided, he "guessed" that if he testified that his lawyers would ask him questions first but was not sure. (*Id.*) He knew that prosecutors could then question him. (Dr. Weller's Psych. Eval. 2/13/2025 at 10.) When asked what prosecutors would be doing by asking him questions, he said, "To get evidence against you." (*Id.*) He believed that he would have to tell "everything" that happened if he testified. (*Id.*)

Lopez-Ozuna described evidence as "stuff they can use against you" and that it could harm someone's case. (*Id.*) When asked how, he said, "They find something against you," but could not elaborate or provide more information. (*Id.* at 11.) Lopez-Ozuna said he did not know what evidence the prosecutors have against him or the strength of their case. (Dr. Weller's Psych. Eval. 2/13/2025 at 11.) He knew that "evidence could help someone's case[,]" but he could not provide examples of evidence generally or how evidence might be helpful. (*Id.* at 10–11.) When asked what are the chances that he would be found guilty, he did not know. (*Id.* at 11.)

Lopez-Ozuna knew the names of his attorneys, and that they are defense attorneys and not prosecutors. (*Id.*) He believes his attorneys are public defenders and the government was paying them. (*Id.*) He said his lawyers "come to see [him] sometimes" and he sometimes sees them "a day before court or the day after." (Dr. Weller's Psych. Eval. 2/13/2025 at 11.) Lopez-Ozuna believed he last saw his attorneys two weeks ago, but could not say how many times, in total, he has met with them. (*Id.*) When asked what confidentiality meant, he said, "It stays private." (*Id.*) He could not provide a response when asked to explain what stays private. (*Id.*) Lopez-Ozuna said he trusted his attorneys "a little bit[,]" but could not elaborate. (*Id.*) He denied that he was concerned about working with his attorneys and denied disagreeing with them about how they are handling his case. (Dr. Weller's Psych. Eval. 2/13/2025 at 11.) Lopez-Ozuna felt that his attorneys were doing a good job on his case; he could not provide ideas about what his attorneys

should do to help his case.  (*Id.*)  He said his lawyers have not yet asked him to do anything to help with his case.  (*Id.*)  Lopez-Ozuna was not aware that participating in the competency evaluation was helping his attorneys.  (*Id.*)

When asked what he hopes will happen with his case, he was quiet initially and then said, " I hope they let me get out sooner[,]" but did not elaborate further.  (*Id.*)  When asked how likely it was that his attorneys could get the charges dropped, Lopez-Ozuna said "maybe."  (Dr. Weller's Psych. Eval. 2/13/2025 at 11.)  He said he would go along with his attorneys if they could get his charges dropped or lowered.  (*Id.* at 12.)  When asked what he would like the outcome of a trial to be, Lopez-Ozuna said, "I would want them to be on [my] side."  (*Id.* at 11.)  He could not respond when asked who he wanted to be on his side.  (*Id.*)  All Lopez-Ozuna said about a trial was, "I feel like I would just like the answer right now."  (Dr. Weller's Psych. Eval. 2/13/2025 at 12.)  He did not know if he would appeal a guilty verdict.  (*Id.*)

Lopez-Ozuna said that he had not discussed legal strategy with his lawyers and did not know what plea he would enter.  (*Id.*)  When asked if he would want to testify, he said, "Probably no."  (*Id.*)  When asked why, Lopez-Ozuna said he felt "a little bit worried."  (*Id.*)  When asked why again, he responded, "If I say something wrong."  (Dr. Weller's Psych. Eval. 2/13/2025 at 12.)  Lopez-Ozuna confirmed that he would go along with his attorneys if they decided that he should not testify.  (*Id.*)  He could not provide advantages or disadvantages about testifying.  (*Id.*)

With respect to Lopez-Ozuna's capacity to disclose pertinent information to his attorneys, Dr. Weller noted that he does not recall anything during the hour and a half before the accident except that he was arrested in Tucson on August 9, 2024, and that he was interacting with seven (7) people on that day.  (*Id.*)  He does not know what police officers did or said because he lost consciousness during the accident.  (*Id.*)  Lopez-Ozuna only remembers waking up in the hospital hours or possibly a day after the accident.  (Dr. Weller's Psych. Eval. 2/13/2025 at 12.)  He does not remember what law enforcement reports say about the incident.  (*Id.*)

Lopez-Ozuna denied that he could help his attorneys find potential witnesses to help his case. (*Id.*) When asked whether he could tell his attorneys if he thought a witness was lying in court or leaving out details, he said, "Maybe. Not sure." (*Id.*) When asked how or when he would tell his lawyers if that happened, Lopez-Ozuna responded, "If they say something different than what happened . . . I would tell them when I'm sitting next to them." (*Id.*) Lopez-Ozuna knew that he could ask his lawyers if he did not understand something a witness said in court. (Dr. Weller's Psych. Eval. 2/13/2025 at 12.) When asked if anyone may tell lies about his case, he said, "[p]robably"; when asked why someone might lie, he said, "I don't know." (*Id.*) Lopez-Ozuna is not sure what his lawyers need to know from him to help them in court and could not think of anything he could tell his lawyers to help his case. (*Id.* at 13.)

With respect to Lopez-Ozuna's ability to control his behavior in the courtroom, Dr. Weller noted that he said that he is supposed to be "quiet" and "respectful." (*Id.*) He knew that he could only speak when the judge talks to him. (*Id.*) He also knew that he could "get in more trouble" if he spoke or moved around without permission. (Dr. Weller's Psych. Eval. 2/13/2025 at 13.) Lopez-Ozuna does not believe that he will have a problem controlling his behavior in court. (*Id.*) When asked what he usually did in the courtroom during hearings, he responded, "Sit there." (*Id.*) Lopez-Ozuna said that he did not really understand what was being talked about in court. (*Id.*) He denied taking notes or knowing what to ask his attorneys after a court appearance. (*Id.*)

Lopez-Oznua said he has been housed at CoreCivic for about three months. (Dr. Weller's Psych. Eval. 2/13/2025 at 13.) He denied taking medication for mental health issues. (*Id.*). When asked if he would be willing to take medication, Lopez-Ozuna said he would be willing to take medication for his pain. (*Id.*) He did not know if he has a mental illness and did not know that anxiety and depression were considered mental illnesses. (*Id.*) Lopez-Ozuna thought he may get depressed from being in jail and did not know if his mental health would suffer under the stress of a trial. (*Id.*)

Lopez-Ozuna did not know what the term "competency to stand trial" meant. (Dr.

Weller's Psych. Eval. 2/13/2025 at 13.)  After education was provided, he was asked if he thought he was competent, and responded, "Not really."  (*Id*.)  When asked why he did not think he was competent, Lopez-Ozuna said, "Just by not understanding certain things." (*Id*.)  After more education was provided and he was asked what it meant if a person was not competent, he said, "They don't know what's going on."  (*Id*.)  Lopez-Ozuna did not know what would happen if person was found not competent.  (*Id*. at 13–14.)  When asked why his lawyers were trying to find out if he is competent, he responded, "To help out with my case?"  (Dr. Weller's Psych. Eval. 2/13/2025 at 14.)  When asked what he hoped the results of the competency evaluation will be, Lopez-Ozuna said, "Good results, help my case."  (*Id*.)

### 2.  November 7, 2024 meeting

Many of Dr. Weller's comments about Lopez-Ozuna's presentation at the meeting on November 7, 2024, were identical to those made about their October meeting.  (Dr. Weller's Psych. Eval. 2/13/2025 at 4.)  She noted that rapport was easily re-established and Lopez-Ozuna was oriented to person, place, date, and time; he was off Mental Health Watch; his emotional presentation was stable and somewhat dysphoric; he never responded to internal stimuli or demonstrated perseverative thoughts; his thought processes were mostly coherent, logical, linear, and goal directed; he used simple vocabulary and diction and had occasional word-finding difficulties; his speech was of normal rate, volume, and prosody; and he cooperated with tasks and showed adequate frustration tolerance.  (*Id*.) Short breaks were provided between tests and transitioning from tests to interviewing.  (*Id*.) After about two hours, he had difficulty focusing, required longer times to respond to questions, and sometimes asked for questions to be repeated.  (*Id*.)  Lopez-Ozuna also reported that his back and hip were bothering him.  (*Id*.)

### 3.  January 9, 2025 meeting

At the third meeting on January 9, 2025, Lopez-Ozuna said that he would like to get a job at CoreCivic so he can stay busy during the day.  (Dr. Weller's Psych. Eval. 2/13/2025 at 4.)  He also said he would like to move to a different pod because some inmates steal

other people's belongings. (*Id.*) Lopez-Ozuna had not been back on Mental Health Watch. (*Id.*) Once again, many of Dr. Weller's comments about Lopez-Ozuna's presentation at this meeting were identical to those made about prior meetings. (*Id.*) Specifically, she noted that rapport was easily re-established and Lopez-Ozuna was oriented to person, place, date, and time; his emotional presentation was stable and euthymic; he never responded to internal stimuli; his thought processes were mostly coherent, logical, linear, and goal directed; he used simple vocabulary and diction and had occasional word-finding difficulties; his speech has of normal rate, volume, and prosody; he never spoke spontaneously; and he was cooperative and had adequate frustration tolerance but limited stamina. (*Id.*) Short breaks were provided between tests because he became somnolent and started dozing off during a computerized test for attention. (Dr. Weller's Psych. Eval. 2/13/2025 at 4.) Although Dr. Weller roused Lopez-Ozuna several times, the evaluation session ended early because of his fatigue and inability to stay alert. (*Id.*)

### 4. January 16, 2025 meeting

During the final meeting on January 16, 2025, Dr. Weller noted that she worked hard to keep Lopez-Ozuna awake, alert, and engaged. (Dr. Weller's Psych. Eval. 2/13/2025 at 5.) He lost focus on the first test administered; Dr. Weller had to remind him twice during a test an auditory attention to pay attention and respond appropriately. (*Id.*) He processed information slowly and worked slowly on timed tasks even though instructed to work as quickly as possible. (*Id.*) He sped up for short bursts and then slowed down. (*Id.*) He used strategies (e.g. counting on his fingers) to help solve academic problems that were immature for his age. (*Id.*) He also whispered when reading even though he was directed to stay silent. (Dr. Weller's Psych. Eval. 2/13/2025 at 5.) Several times he had to be specifically directed to start a task; otherwise, he would sit quietly and become lost in his thoughts. (*Id.*) He benefited from verbal prompts and required repetition of instructions to a greater degree anticipated for his age. (*Id.*)

Dr. Weller noted for the first time that Lopez-Ozuna had poor hygiene: his hair was unwashed and he had dandruff, his clothes were unwashed and soiled, and he wiped his

nose on the back of his hand or shirt cuffs.  (*Id.*)  Like in prior visits, Dr. Weller noted that: his emotional presentation was stable and neutral; he never responded to internal stimuli; he used simple vocabulary and diction and had occasional word-finding difficulties; his speech was of normal rate, volume, and prosody; he cooperated with tasks and showed adequate frustration tolerance; and his thought processes were mostly coherent, logical, linear, and goal directed.  (*Id.*)  However, she noted that he seemed to have paucity of thought and never asked questions except for the repetition of instructions.  (Dr. Weller's Psych. Eval. 2/13/2025 at 5.)

During this meeting, Dr. Weller reiterated many of her October 31, 2024, questions regarding legal concepts and key players in the courtroom.  (*Id.* at 7.)  When Dr. Weller asked Lopez-Ozuna to list his basic rights, he said: "Like, what do you mean?"  (*Id.*)  Dr. Weller mentioned the right to remain silent and asked about other rights.  (*Id.*)  Lopez-Ozuna said, "If you can't afford an attorney, one will be given to you."  (*Id.*).  As in the October 31, 2024 meeting, he could not explain why it was important for everyone to be provided with an attorney if they cannot afford one.  (Dr. Weller's Psych. Eval. 2/13/2025 at 7.)  He explained the right to remain silent as follows:  "You have the right not to tell them nothing"; he clarified that "them" is "the cops."  (*Id.*)  When asked what it means that anything you say can be used against you in court, he said, "Means anything you say before they arrest you, they can use it against you."  (*Id.*)  When asked to explain what he meant, he responded, "They can use it as evidence."  (*Id.*)  He said that he did not know what could happen if the police used what a person said against them in court.  (*Id.*)  When asked to explain what having the right to have an attorney means, he said, "Just that you need a lawyer." (Dr. Weller's Psych. Eval. 2/13/2025 at 7.)  When asked why, he asked, "So they can help you?"  (*Id.*)  When asked how a lawyer could help you, he said, "Help you get out [of jail]."  (*Id.*)  When asked to explain the right to a trial, Lopez-Ozuna responded, "I don't know."  (*Id.*)

When asked to explain the types of pleas, he said not guilty and guilty.  (*Id.* at 8.)  He was reminded that there are two other types of pleas, but he could not recall them.  (Dr.

Weller's Psych. Eval. 2/13/2025 at 8.)  When asked what the guilty but insane meant, he said, "You did the crime when you weren't . . . thinking right," but he could not elaborate further.  (*Id.*)

Lopez-Ozuna was asked to explain probation, and he responded, "It means they . . . did a crime, and they just got out [of jail]."  (*Id.*)  He appeared confused when asked what happens when someone is on probation.  (*Id.*)  Dr. Weller noted that when asked what a person has to do when on probation, Lopez-Ozuna said "check in."  (Dr. Weller's Psych. Eval. 2/13/2025 at 9.)  When asked with whom, he said a "probation officer."  (*Id.*)  Lopez-Ozuna said that the requirements of probation could be "[c]urfew, no drugs or alcohol."  (*Id.*)  When asked if there was anything else, he said, "Don't get arrested."  (*Id.*)

As with the October 31, 2024, interview, Lopez-Ozuna could not provide the advantages or disadvantages of testifying at trial.  (*Id.* at 12.)  When again asked what he hopes will happen with his case, he responded, "To get out." (Dr. Weller's Psych. Eval. 2/13/2025 at 11.)  When asked if that meant he hoped his attorneys would get the charges dropped or changed, he said: "Well, it depends," but could not elaborate further.  (*Id.*)

Dr. Weller discussed the following collateral sources that she reviewed in great length and detail in her report:  Dr. Johnson's report and his conclusions; Lopez-Ozuna's developmental history; his educational and learning history, including school records; medical records documenting his physical health history, including his two heard injuries; his family health, social history, substance abuse history, psychiatric history, and employment history.  (*Id.* at 14–31.)  Dr. Weller also set forth the tests performed on Lopez-Ozuna and the results of those tests.  (*Id.* at 31–57.)  Because Dr. Weller testified thoroughly about the collateral sources of information, testing, the results of the tests, the Court will not summarize those portions of her report, other than to note her diagnoses and opinions based on her evaluation.

Dr. Weller diagnosed Lopez-Ozuna with ADHD; borderline intellectual functioning; Adjustment Disorder with Mixed Anxiety and Depressed Mood; Alcohol Use Disorder (in partial remission); Cannabis Use Disorder (in partial remission); Simulant Use

Disorder (in partial remission); History of Child Physical and Psychological Abuse; and Status post head injuries in 2023 and 2024.  (*Id.* at 59.)  She also believes that he has neurodevelopmental disorders which, in combination with her with other diagnoses, have resulted in significant cognitive and intellectual deficits.  (*Id.* at 58.)  Specifically, his lower-level cognitive functioning interferes with aspects of his rational understanding of the proceedings against him and prevents him from having a reasonable ability to assist defense counsel.  (Dr. Weller's Psych. Eval. 2/13/2025 at 58.)  She noted that because these deficits are neurologically based, they cannot be modified by medication or therapy.  (*Id.*)  Although he is capable of repeating what people tell him, he lacks the ability to understand material at an abstract level or apply it meaningfully to his own case.  (*Id.*)  As a result, Dr. Weller's opinion is that Lopez-Ozuna is not competent to stand trial.  (*Id.* at 57.)

## II.    EVIDENTIARY HEARING

Because of the conflicting opinions about whether Lopez-Ozuna is competent to stand trial, the Court held an evidentiary hearing on March 4, 2025.  (*See* Minute Entry 3/4/2025 (Doc. 103).)  The testimony of Dr. Johnson and Dr. Weller are set forth in detail below.

### A. Testimony of Dr. Bradley Johnson

#### 1.  Direct Examination

Dr. Johnson has been a psychiatrist for nearly thirty (30) years and has been doing forensic competency evaluations for over thirty (30) years.  (Hr'g Tr. 3/4/2025 (Doc. 113) at 11.)  He has done hundreds of competency evaluations for state and federal courts.  (*Id.* at 11–12.)  Dr. Johnson conducted a competency evaluation of Lopez-Ozuna on December 23, 2024.  (*Id.* at 12; *see also* Dr. Johnson's Competency to Stand Tr. Eval. re: Lopez-Ozuna (Doc. 78) at 1.)  The 90-minute evaluation was conducted in Dr. Johnson's office.  ((Doc. 113) at 12–13; *see also* (Doc. 78) at 1.)  Lopez-Ozuna "presented fairly reasonably. He was well groomed.  He struck up a conversation . . . fairly easily.  He was easy to interview [and was] fairly logical in his discussions with [Dr. Johnson]."  ((Doc. 113) at 13.)  Dr. Johnson explained that there are times when he does a competency evaluation

where the individual "is not very cooperative[,] [t]hey don't want to answer questions" or are "simply not willing to cooperate." (*Id*.) Lopez-Ozuna was "very cooperative, very responsive to questions." (*Id*.) Dr. Johnson described Lopez-Ozuna's answers to follow logically from questions. (*Id*.) Dr. Johnson reported that there were times at the beginning of the interview where they had "a little more free conversation[,] [b]ut then [Lopez-Ozuna] would respond to questions" that were asked throughout the interview. (*Id*.)

Dr. Johnson testified that he began the interview by making sure Lopez-Ozuna "understood what the evaluation was all about, making sure he understood who I was so that so we [could] proceed[;] [h]e gave consent to participate as part of the evaluation[,] [a]nd then we went on to get some basic information." ((Doc. 113) at 14.) Lopez-Ozuna was asked "where he was born, his birthday and some simple things about his background, where he was living." (*Id*.; *see also* (Doc. 78) at 1.) Dr. Johnson then asked about Lopez-Ozuna's social history to learn about his family, his educational and work background, his medical background and any psychiatric history, his substance abuse history, any military service, his marital status, and whether has children. ((Doc. 113) at 14–15; *see also* (Doc. 78) at 1–3.) Lopez-Ozuna "was able to give reasonable answers" to each question. ((Doc. 113) at 14.)

Dr. Johnson and Lopez-Ozuna then "discussed his case itself." (*Id*. at 15.) Dr. Johnson asked Lopez-Ozuna "questions about how the court works, the role[s] of the key individuals in the court proceeding," which are the standard questions asked in a competency evaluation. (*Id*.; *see also* (Doc. 78) at 3–4.) Specifically, Dr. Johnson asked, "why he had been arrested, what the charges were that had been brought against him, and then his version of the events that happened at the time of the offense." ((Doc. 113) at 15; *see also* (Doc. 78) at 3.) Lopez-Ozuna "told a story as to what happened. He was able to logically go through what happened." ((Doc. 113) at 15; *see also* (Doc. 78) at 3.) Dr. Johnson asked a few clarifying questions, but Lopez-Ozuna "was able to give his version fairly reasonably." ((Doc. 113) at 15.) Dr. Johnson asked Lopez-Ozuna "generally what his charges were." (*Id*. at 16.) He told Dr. Johnson "what the charges were and was able

to actually outline those as they are." (*Id.*) Lopez-Ozuna "was able to explain that he had been arrested for transportation of illegal aliens[;]" the charges "had to do with people being put at risk for harm," and that one charge had to do with one person dying. (*Id.*) He said there were federal and state charges. (*Id.*)

More specifically, Lopez-Ozuna "talked about alien smuggling resulting in death[,] [and] [t]hat it had to do with the car he was driving." ((Doc. 113) at 18.) He also said that there were state charges "regarding something about conspiracy and theft." (*Id.*) He said that "he was involved in a situation in which he didn't pull over[.]" (*Id.*)

Dr. Johnson asked Lopez-Ozuna to explain what happened the day of his arrest. (*Id.*) He said that he was contacted through a WhatsApp text message; that it had been set up through a friend; and that his friend had contacted whoever he had set up to do this with for him. (*Id.*) Lopez-Ozuna further explained that "[t]he people he said that he was connected with were to pay him for doing the action that . . . was going to take place." ((Doc. 113) at 18.) Lopez-Ozuna told Dr. Johnson that he had never done this before; "that he needed money; and that he had been offered $7,000 to engage in this." (*Id.*) Lopez-Ozuna explained to Dr. Johnson "that there were seven (7) people; that he was to meet them in Arivaca or near Arivaca down by the border to pick up the people; that they were to be in the desert; and that that's where he met them." (*Id.*) Lopez-Ozuna described to Dr. Johnson that the pick-up location "was near the side of a mountain[,] [and] [h]e did not know [the people]." (*Id.* at 18–19.) Lopez-Ozuna told Dr. Johnson "that a friend was riding with him[,] [and] [t]hey were driving a Chevrolet Tahoe . . . that was under his mother's name." (*Id.* at 19.) Lopez-Ozuna further described to Dr. Johnson that "there were both men and women; that they were younger[—][h]e thought maybe in their twenties." ((Doc. 113) at 19.) Dr. Johnson testified that "it was hard [for Lopez-Ozuna] to recall all of the details[,] [b]ut he [said], 'I recall being on a dirt road and then on a regular road[;] I looked back and I saw lots of people in the car.'" (*Id.*) Lopez-Ozuna explained to Dr. Johnson that "originally there was just to be three people" in his car and his friend was supposed to have the other people in another car. (*Id.*) There ended up

being seven people in Lopez-Ozuna's car. (*Id.*) Lopez-Ozuna told Dr. Johnson that he was supposed to take the people "to Phoenix, but he didn't know where in Phoenix as of yet." (*Id.*)

After recounting these facts, Lopez-Ozuna told Dr. Johnson: "'Then I woke up in the hospital.' He didn't have a recollection of what happened from that point up . . . to the next morning." ((Doc. 113) at 19; *see also* (Doc. 78) at 3.) Lopez-Ozuna told Dr. Johnson that "he kn[e]w[] the cops were chasing him[.]" ((Doc. 113) at 19.) Lopez-Ozuna explained to Dr. Johnson "his mother and girlfriend had read an article about them chasing him[,] [s]o he had learned from his mother about that." (*Id.*) Lopez-Ozuna then said to Dr. Johnson that "he had no recollection of the motor vehicle accident that had happened, but that he was aware that there had been a motor vehicle accident[;] . . . five people had been hurt badly, and one female had been killed." (*Id.*) Dr. Johnson testified that Lopez-Ozuna told him this story in a narrative form and "in a very logical way." (*Id.* at 19–20.)

With respect to legal concepts, Dr. Johnson began "by asking about the roles of sort of the key individuals." (*Id.* at 20.) Lopez-Ozuna provided his attorney's name and explained the role of a defense attorney. ((Doc. 113) at 20; *see also* (Doc. 78) at 3.) Specifically, "[Lopez-Ozuna] explained that the defense attorney was there to help him in regard to his case." ((Doc. 113) at 20; *see also* (Doc. 78) at 3.) Dr. Johnson testified that Lopez-Ozuna said that he has met with and trusts his attorney. ((Doc. 113) at 20; *see also* (Doc. 78) at 3.) Lopez-Ozuna was able to explain the role of a prosecutor to Dr. Johnson. ((Doc. 113) at 20; *see also* (Doc. 78) at 3.) He told Dr. Johnson that the prosecutor "is there to try to prove that he is guilty[.]" ((Doc. 113) at 20; *see also* (Doc. 78) at 3.) Dr. Johnson testified that Lopez-Ozuna "understood the adversarial nature of the court proceeding; that the two worked against each other." ((Doc. 113) at 20; *see also* (Doc. 78) at 3.)

Dr. Johnson further testified that Lopez-Ozuna explained that "a jury is a group of people that generally sit to the side of the courtroom; and that they would listen to the information that is presented from both sides, and then they would make a determination

1    or a decision if one was guilty or not guilty." ((Doc. 113) at 20–21; *see also* (Doc. 78) at

2    3–4.)  When asked who would decide guilt if there was not a jury, Lopez-Ozuna told Dr.

3    Johnson "that the judge would." ((Doc. 113) at 21; *see also* (Doc. 78) at 4.)

4        When Dr. Johnson asked Lopez-Ozuna what the judge would do if he was found

5    guilty, he responded that "he would receive a sentence at that point." ((Doc. 113) at 21;

6    *see also* (Doc. 78) at 4.)  Dr. Johnson went on to ask about sentencing. ((Doc. 113) at 21.)

7    Lopez-Ozuna "stated that he was aware that he would be facing life in prison[,] . . . [and]

8    that made him very anxious because it was a fairly serious possible outcome that he can be

9    facing." (*Id.* at 21; *see also* (Doc. 78) at 4.)

10        They also talked about the concept of a plea agreement. ((Doc. 113) at 21; *see also*

11   (Doc. 78) at 4.)  Dr. Johnson testified that Lopez-Ozuna "actually said that he had been

12   offered a plea agreement on the state's case." ((Doc. 113) at 21.)  Lopez-Ozuna explained

13   that a plea agreement is "when one admits that they're guilty, but that they generally will

14   admit they're guilty to a lesser charge or lesser number of charges." (*Id.*)  Lopez-Ozuna

15   further indicated that "the outcome would be that [the person pleading guilty] would

16   receive a smaller or lower sentence because of that." (*Id.*)  Dr. Johnson asked if Lopez-

17   Ozuna knew whether he would go to trial if he were to take a plea agreement, and "he said

18   no, he would not go to trial." (*Id.* at 21–22.)

19        Dr. Johnson testified that he and Lopez-Ozuna then talked "about the concepts of

20   his legal rights." (*Id.* at 22.)  Dr. Johnson asked Lopez-Ozuna to explain his legal rights.

21   ((Doc. 113) at 22.)  He began by saying "that he had the right to be quiet[.]" (*Id.*; *see also*

22   (Doc. 78) at 4.)  When asked what that meant, Lopez-Ozuna explained that "he has the

23   right to not have to speak with" the police; "he went on to explain the right to remain silent,

24   even though that was not the term that he brought up on his own." ((Doc. 113) at 22; *see*

25   *also* (Doc. 78) at 4.)  Dr. Johnson testified that Lopez-Ozuna could not recall other rights,

26   so Dr. Johnson started to provide education about the right to have an attorney.  ((Doc.

27   113) at 22.)  At that point, Lopez-Ozuna cut him off and said, "Oh yeah.  I remember that

28   one." (*Id.*; *see also* (Doc. 78) at 4.)  Dr. Johnson observed that based on their earlier

conversation, Lopez-Ozuna did know about the right to an attorney, but could not remember it on his own.  ((Doc. 113) at 22.)

Dr. Johnson brought up "the right to a fair trial", which Lopez-Ozuna did not bring up on his own.  (*Id.*)  Dr. Johnson testified that Lopez-Ozuna said, "that was something that he was not aware of, but [they] did talk about the right to a fair trial."  ((Doc. 113) at 22; *see also* (Doc. 78) at 4.)  Specifically, Dr. Johnson explained to Lopez-Ozuna that the right to a fair trial meant that "he had a right to a trial[;] . . . he would be treated fairly by the court; [and] that [the trial] would be handled in a fair manner to be able to have a fair outcome."  ((Doc. 113) at 23.)  Dr. Johnson testified that Lopez-Ozuna seemed to understand this concept "without difficulty."  (*Id.*; *see also* (Doc. 78) at 4.)  Dr. Johnson asked if Lopez-Ozuna thought he could have a fair trial, and "he said he was not sure."  ((Doc. 113) at 23; *see also* (Doc. 78) at 4.)  When Dr. Johnson asked why he felt that way, Lopez-Ozuna said, "'Well, you know, this is . . . a very serious case.'"  ((Doc. 113) at 23.)  Dr. Johnson could not recall Lopez-Ozuna's exact wording, but he testified that it was basically that "it was a case that people might jump to conclusions on, that type of thing." (*Id.*)  That comment, as well as their entire conversation, demonstrated to Dr. Johnson that Lopez-Ozuna understands the seriousness of the case and that "it may have a bad outcome." (*Id.*)  The seriousness of the case was something that Lopez-Ozuna brought up to Dr. Johnson.  (*Id.*)  Dr. Johnson had "no sense" that Lopez-Ozuna thought he could not have a fair trial "because of some type of mental health issue, such as being psychotic" or "being paranoid about a trial or something along those lines."  ((Doc. 113) at 23.)  Rather, Lopez-Ozuna was simply "concerned about the possible outcome[.]"  (*Id.*)

When asked whether he had to educate Lopez-Ozuna about legal concepts or "explain some terms to him that he maybe didn't fully grasp," Dr. Johnson testified that Lopez-Ozuna "had a basic understanding of these terms" and did not require additional explanation.  (*Id.* at 23–24.)  Dr. Johnson noted that he "repeated a couple questions to simplify at times, but that was the extent of it."  (*Id.* at 24.)  Dr. Johnson further testified that Lopez-Ozuna "was able to answer those questions without any major difficulty."  (*Id.*)

Dr. Johnson administered the Folstein Mini-Mental Status Examination. ((Doc. 113 at 24; *see also* (Doc. 78) at 4.) Dr. Johnson described this examination as "a fairly common screening evaluation used for dementia or cognitive problems." ((Doc. 113) at 25.) Dr. Johnson testified that a low score on this test would mean that "possibly more testing would need to be done or that there might be more problems cognitively with the individual." (*Id*.) Dr. Johnson observed that the test "may or may not have a bearing on competency." (*Id*.) Dr. Johnson reiterated that it is "just a simple screening evaluation to make sure [he] [is] not missing anything" regarding a person's "ability to think clearly." (*Id*.) Dr. Johnson reported that Lopez-Ozuna "scored fairly well . . . on the test[,] and noted that "[h]e scored 28 out of the possible 30 points." (*Id.* at 26.) Dr. Johnson opined that there was "nothing significant as far as major cognitive issue[s] or [a] dementia problem" with Lopez-Ozuna. ((Doc 113) 26.) Dr. Johnson was clear that given the limited purpose of the test, it had no bearing on his competency evaluation. (*Id*.)

Dr. Johnson described Lopez-Ozuna's speech "toward the end of the 90 minutes" and "some of [his] physical traits" as "[coming] across in a fairly unremarkable way." (*Id*.) Dr. Johnson testified that "[t]here was nothing that jumped out of extreme concern[,]" and observed that Lopez-Ozuna was "able to cooperate [during] the entire evaluation[;] . . . was pleasant during the entire time[;] [and] [n]othing . . . was outstanding." (*Id.*) Dr. Johnson emphasized that he did not notice anything of concern and was confident in making an assessment. (*Id*. at 26–27.)

In preparing his report, Dr. Johnson reviewed "additional collateral sources," which included a letter from defense expert Dr. Weller, the investigative reports, and an audio recording of an interview with Mr. Lopez-Ozuna on August 11, 2024. ((Doc. 113) at 27.) The investigative reports helped Dr. Johnson understand "what had been documented as to what happened at the time of the incident." (*Id*.) The investigative reports were consistent with the story told by Lopez-Ozuna about the incident that led to the criminal charges. (*Id*. at 28.) Dr. Johnson testified that the audio recording of the interview was very hard to hear and did not have "a lot of bearing as far as competency goes." (*Id*. at 27–28.) "[T]he letter

from Dr. Weller had expressed her preliminary findings, her concerns that he may have some cognitive issues[,]" and that she may do additional testing. (*Id.* at 28.)

Prior to testifying, Dr. Johnson reviewed Dr. Weller's final report in which she opined that Lopez-Ozuna is not competent. ((Doc. 113) at 28.) Dr. Johnson testified that "[i]t's not uncommon" to have conflicting opinions on competency. (*Id.*) Dr. Johnson opined that Dr. Weller "took a different approach to competency." (*Id.* at 29.) Dr. Johnson noted that Dr. Weller did a substantial amount of neuropsychological testing; however, she asked many of the same questions that he asked Lopez-Ozuna. (*Id.*) Dr. Johnson further testified that "it appears that [Dr. Weller] may have questioned [Lopez-Ozuna] to a more sophisticated level of understanding of some of those concepts than what I did." (*Id.*) Dr. Johnson explained that he tries to ask questions about legal concepts "in a very straightforward simplistic manner." ((Doc. 113) at 29.) He explained that this approach works best with most individuals during a competency evaluation because "[p]eople that have been referred for competency often have some type of problem[,] [u]sually a mental health problem[,] . . . once in a while because of cognitive issues[,] [a]nd so keeping things simple and straightforward I think has been the best way to do that." (*Id.*) Dr. Johnson further explained that he does not ask more abstract questions, such as the relative importance of certain concepts, because "the concept of competency to stand trial is a basic understanding of those things[;] [i]t's not taking it to an advanced level." (*Id.* at 29–30.)

Dr. Johnson is familiar with some of the testing done by Dr. Weller, but noted that he is a not a neuropsychologist, so although he had heard of each of the tests, he was not familiar with all of them. (*Id.* at 30.) Dr. Johnson testified that the "IQ testing" performed by Dr. Weller was helpful, because although Lopez-Ozuna "was able to communicate without difficulty, he . . . did come across in a rather concrete manner." (*Id.* at 30–31.) Lopez-Ozuna's IQ score of 78 is below average, but "not low enough where it's considered an intellectual disability[.]" ((Doc. 113) at 31.) Dr. Johnson observed that Lopez-Ozuna's IQ score "was consistent with the way" he came across, and helped clarify his actual intelligence level. (*Id.*)

Dr. Johnson's diagnoses for Lopez-Ozuna were "almost identical" to Dr. Weller's diagnoses. (*Id.*) Dr. Johnson diagnosed Lopez-Ozuna with an adjustment disorder with anxiety, and Dr. Weller diagnosed an adjustment disorder with anxiety and depression. (*Id.*) They both listed substance abuse problems and a history of head trauma. (*Id.* at 31–32.) Dr. Johnson "listed a rule-out diagnosis of attention-deficit/hyperactivity disorder," commonly referred to as ADHD. ((Doc. 113) at 31.) A "rule-out" diagnosis is a medical term which means that there is information to suggest a diagnosis; if additional information is obtained the diagnosis would either be confirmed or ruled-out. (*Id.* at 32.) Dr. Johnson was aware that Lopez-Ozuna had a history that was consistent with ADHD, but generally he would want more information—such as educational records or speaking with his family about symptoms when he was younger—to support that diagnosis. (*Id.*) Dr. Weller diagnosed Lopez-Ozuna with ADHD, and after reviewing her testing, Dr. Johnson agreed with that diagnosis. (*Id.* at 31.) Dr. Weller had Lopez-Ozuna's educational records and "did additional testing that seemed to be consistent with impulsivity and other symptoms" that would help in making the ADHD diagnosis. (*Id.* at 32–33.) Dr. Johnson also agreed with Dr. Weller's diagnosis of "borderline intellectual functioning" based on her testing. ((Doc. 113) at 31.) Neither the ADHD nor borderline intellectual functioning diagnoses change Dr. Johnson's ultimate conclusion that Lopez-Ozuna is competent. (*Id.* at 33.)

Dr. Johnson was not provided with Lopez-Ozuna's medical or educational records. (*Id.*) Lopez-Ozuna did provide details regarding past head trauma and his schooling in a reasonable manner. (*Id.*) Lopez-Ozuna never refused to answer any question and never requested a break during the 90-minute interview. (*Id.* at 34.) Dr. Johnson testified that Lopez-Ozuna's "mental engagement" was "reasonable throughout the entire evaluation." ((Doc. 113) at 34.)

Dr. Johnson reiterated his opinion that Lopez-Ozuna is competent to stand trial. (*Id.* at 35.) Dr. Johnson testified that his opinion was based on his evaluation of Lopez-Ozuna, including "his ability to cooperate with . . . questioning, . . . [his ability] to describe what happened at the time of the offenses, and his ability to communicate in a logical and

reasonable manner[.]"  (*Id.* at 34.)  Dr. Johnson further explained that Lopez-Ozuna "demonstrated a basic and fundamental understanding of the workings of the court and demonstrated . . . a rational and factual understanding of . . . the role of the key individuals in the court proceeding."  (*Id.*)  These observations led to Dr. Johnson's conclusion that Lopez-Ozuna "is able to rationally assist his attorney and help him prepare his defense[.]" (*Id.*)  Dr. Johnson concluded that Lopez-Ozuna demonstrated these traits and understanding "to what is generally considered the level needed for competency to stand trial."  ((Doc. 113) at 35.)

### 2.  Cross-Examination

Dr. Johnson agreed that it is important to conduct a thorough evaluation and review all available material, such as medical and educational records, before making a diagnosis. (Hr'g Tr. 3/4/2025 (Doc. 113) at 36.)  Dr. Johnson is aware that Lopez-Ozuna had suffered two (2) brain injuries and was young, approximately eighteen (18) years old, at the time of his evaluation.  (*Id.* at 36–37.)  Dr. Johnson confirmed that he was not provided with Lopez-Ozuna's medical, educational, or psychological records that may have existed.  (*Id.* at 37.) Dr. Johnson requested medical and educational records, but was told that "none were available to [him] at that time."  (*Id.*)  Nevertheless, Dr. Johnson was comfortable making a determination about competency.  (*Id.* at 38.)

Dr. Johnson agreed that Dr. Weller's report reflected extensive neuropsychological testing.  ((Doc. 113) at 38.)  Dr. Johnson confirmed his agreement with Dr. Weller's diagnoses of ADHD and borderline intellectual function.  (*Id.* at 39.)  When asked why his opinion that Lopez-Ozuna was competent did not change after reviewing Dr. Weller's report, Dr. Johnson testified that "the addition of that other information" did not change his opinion that Lopez-Ozuna "is competent to stand trial based on his understanding of the court and his ability to work with his attorney."  (*Id.*)  The results of the neuropsychological testing also did not change his opinion.  (*Id.*)  The fact that tests show that Lopez-Ozuna struggled with some of the tests did not cause Dr. Johnson to "revise or rethink" his opinion "because he still understood the competency issues."  (*Id.* at 39–40.)

Dr. Johnson's meetings with patients in his clinical practice range from a "[m]inimum of about a half hour" to "an hour or sometimes longer." ((Doc. 113) at 40.) Dr. Johnson testified that he performs an initial evaluation or screening of his patients. (*Id.*) He attempts to "diagnose what is going on and then put together a treatment plan for them" based on what he concludes. (*Id.* at 40–41.) Dr. Johnson testified that he would refer a patient to a neuropsychologist if there was a question about cognitive issues or memory and it would be useful to do so. (*Id.* at 41.)

Dr. Johnson confirmed that he has performed hundreds of competency evaluations, at times up to four a week. (*Id.* at 12, 44.) Dr. Johnson testified that he has been appointed by the court for the vast majority of the competency evaluations he has performed. ((Doc. 113) at 44.) The majority of those evaluations have been for the Pima County Superior Court. (*Id.*) Dr. Johnson has been requested by the prosecution or defense to conduct a competency evaluation "a few times," and of those requests he estimated that more have come from the defense. (*Id.*) Dr. Johnson testified that he has only done "a handful" of competency evaluations in federal court. (*Id.*)

Dr. Johnson testified that the federal standard for competency is the *Dusky* standard.[4] (*Id.* at 45.) Although he did not recall the "exact wording," Dr. Johnson explained that there are two prongs: (1) an individual needs to be able to reasonably communicate with their attorney, meaning "a reasonable degree of rational understanding in regard to working with their attorney"; and (2) to have a rational factual understanding of the workings of the court. ((Doc. 113) at 45.) Dr. Johnson agreed that a defendant might meet one prong but not the other; for example, a defendant could understand the nature of the proceedings but not be able to assist in his defense. (*Id.*)

Dr. Johnson again confirmed that prior to his evaluation of Lopez-Ozuna he reviewed the indictment, police reports, an audio of the interview with the police, and a letter from Dr. Weller. (*Id.* at 46.) He saw Dr. Weller's "raw test data," but because he is not a neuropsychologist who is trained to interpret that information, it was not as helpful

---

[4] *Dusky v. United States*, 362 U.S. 402 (1960).

to him, "with a few exceptions." (*Id.*) Dr. Johnson agreed that reviewing medical and educational records is "best practice" for a diagnosis. (*Id.* at 47.) He explained, however, that in this case "the ultimate issue was not diagnosis, . . . it's competency, which is something different." ((Doc. 113) at 47.) Dr. Johnson agreed that having Lopez-Ozuna's medical and school records would have been "generally helpful," but those records would not have changed his conclusion. (*Id.* at 47–48.) Dr. Johnson observed that Dr. Weller's report "summarized in detail those records[,]" and after reviewing her summary, Dr. Johnson concluded that the records would not have changed his opinion that Lopez-Ozuna is competent. (*Id.* at 48.)

The evaluation of Lopez-Ozuna occurred in the afternoon. (*Id.* at 50.) Dr. Johnson was not aware of what time Lopez-Ozuna "was required to be awakened to be transported" for the evaluation. (*Id.*) Dr. Johnson noted that if Lopez-Ozuna had "presented as being tired," he "might have been concerned about that . . . . [But] he did not present that way, and it was not an issue." ((Doc. 113) at 50.) Dr. Johnson spent ninety (90) minutes with Lopez-Ozuna; he did not request any breaks so none were offered. (*Id.* at 50–51.) Dr. Johnson expressed surprise that Lopez-Ozuna remembered the evaluation taking twenty (20) minutes. (*Id.* at 51.) Dr. Johnson estimated that the MMSE test took approximately five (5) minutes to administer. (*Id.* at 51–52.) Given the types of testifying done by Dr. Weller, it did not surprise Dr. Johnson that she spent almost twelve (12) hours meeting with Lopez-Ozuna. (*Id.* at 52.) Dr. Johnson agreed that "measuring someone's sustained attention over time," like during a trial, differs from measuring attention over 90 minutes. ((Doc. 113) at 52.)

Dr. Johnson did not find Lopez-Ozuna to be "necessarily quiet" during their interview. (*Id.* at 53.) Dr. Johnson testified that Lopez-Ozuna "had a reasonable interaction with [him] throughout." (*Id.*) Lopez-Ozuna never appeared fatigued during their meeting. (*Id.*) Dr. Johnson denied that Lopez-Ozuna needed "prompting to answer questions[.]" (*Id.*) Dr. Johnson noted that there were a couple of occasions when he "reworded questions" for Lopez-Ozuna or asked him to "continue or tell me what happened

next, that type of prompting." ((Doc. 113) at 53.)  Dr. Johnson observed that Lopez-Ozuna's responses "did not go into a lot of detail" and "were relatively short[.]" (*Id.*)  Dr. Johnson also observed that Lopez-Ozuna has a limited vocabulary. (*Id.*)  As a result, Dr. Johnson "conducted the evaluation using a fairly simplistic vocabulary," using "easier-type questions," which he has "found to work best with competency evaluations in general." (*Id.* at 54.)

Dr. Johnson could not estimate the time he spent on each *Dusky* prong; he explained that the *Dusky* prongs "really overlapped" because "you're looking at both prongs throughout the entire evaluation." (*Id.*)  He further explained that "[t]he questions about how the court process works are specific answers to questions[,]" but the ability to work with an attorney is assessed by how a person can work with the evaluator during the evaluation using observations such as cooperativeness with questioning, for example." ((Doc. 113) at 54.)  Dr. Johnson noted "that's something that is ongoing throughout the entire evaluation." (*Id.*)  For the most part, Dr. Johnson's questions to Lopez-Ozuna were "open ended[;]" he rarely asks a yes/no or true/false questions. (*Id.* at 55.)  Dr. Johnson testified that the length of Lopez-Ozuna's answers depended on what they were talking about. (*Id.*)  He further testified that "[t]here were some things that he would expand upon more, but others that I would prompt him." (*Id.*)  Dr. Johnson does not "believe there were a lot of answers that were 'I don't know[,]'" and reported that if it had happened, he would have "have written that down." ((Doc. 113) at 55.)

Dr. Johnson testified that the information regarding Lopez-Ozuna's personal history came directly from Lopez-Ozuna. (*Id.* at 56.)  Dr. Johnson noted that the only information in his report that was from Dr. Weller's letter was in the section where he expressly summarized information from her letter. (*Id.*)  Dr. Johnson reported that the questions to Lopez-Ozuna about his education were open ended. (*Id.*)  Lopez-Ozuna responded to Dr. Johnson that he attended several schools; he was a year behind in his credits; he had average to below average grades; and he had been in special education classes. (*Id.* at 56–57.)

Dr. Johnson confirmed that his practice is to ask for all available records that could

speak to a person's cognition. ((Doc. 113) at 57.)  Dr. Johnson reiterated that he had asked for educational records, but they were not provided.  (*Id.*)  Dr. Johnson again explained that they were "talking about competency[,]" and "one does not necessarily need every bit of information" to assess competency.  (*Id.*)

Dr. Johnson also confirmed that Lopez-Ozuna's medical history contained in his report was from Lopez-Ozuna's answers during the evaluation.  (*Id.* at 58.)  Lopez-Ozuna told Dr. Johnson that he was in a car accident the day of his arrest, injured the front of his head, was unconscious for several hours, and has no recollection of the accident or its aftermath.  (*Id.* at 58–59.)  Dr. Johnson testified regarding the effect on amnesia on competency, as follows:

> Amnesia itself can be an issue because they don't remember what happened. But in competency, it's not considered something that would keep one from being found competent to stand trial.  Rather, can they be able to learn that information of what happened.  Are they able to still work with their attorney despite not remembering something that happened.

((Doc. 113) at 59.)  Lopez-Ozuna told Dr. Johnson that he has struggled with slower thinking and possible memory issues since the accident.  (*Id.*)  Dr. Johnson does not recall if he asked Lopez-Ozuna what he meant by "slower thinking" or how it impacted him. (*Id.*)  Dr. Johnson acknowledged that slower thinking might impact someone's ability to assist counsel.  (*Id.*)

Lopez-Ozuna also told Dr. Johnson that he was involved in a head-on collision in 2023; he said that he hit his head and "might have lost consciousness for a few seconds." (*Id.* at 60.)  Notwithstanding the two recent head injuries, Dr. Johnson did not suggest further evaluation before determining competency.  ((Doc. 113) at 60.)  Dr. Johnson testified that he "did not feel that [Lopez-Ozuna's prior head injuries] affected [his] conclusion regarding competency."  (*Id.*)  Additionally, Dr. Johnson did not feel that a neuropsychological evaluation "was necessary for the issue of competency."  (*Id.*)  Dr. Johnson testified that he might suggest a neuropsychological evaluation "if somebody was not competent in my opinion and that I needed to figure out why and what was going on,

1    perhaps to make a recommendation about restoration issues." (*Id.* at 61.)  Dr. Johnson

2    agreed that two brain injuries in a relatively short period of time might be a concern for

3    competency; however, he added that it is "not necessarily a one-to-one correlation." (*Id.*)

4        With respect to psychiatric history, Lopez-Ozuna said that he struggled with

5    concentration and focus as a child, got off task easily, and was hyperactive and impulsive.

6    ((Doc. 113) at 61–62.)  Dr. Johnson testified that Lopez-Ozuna reported that he still

7    struggles with concentration and focus but not hyperactivity.  (*Id.* at 62.)  Dr. Johnson did

8    not do any "concentration testing."  (*Id.*)  Dr. Johnson's impression of Lopez-Ozuna's

9    concentration during their meeting was "at least fair," meaning that he was able to

10   cooperate and answer questions.  (*Id.*)  Dr. Johnson further explained that "nothing . . .

11   jumped out during the evaluation[,] [there] wasn't an extreme problem with [Lopez-

12   Ozuna's] ability to focus, to cooperate, to concentrate."  (*Id.* at 62–63.)

13       Dr. Johnson confirmed that his report noted that Lopez-Ozuna has occasional

14   difficulty with his memory.  ((Doc. 113) at 63.)  When asked for an example, Dr. Johnson

15   testified that Lopez-Ozuna did not have a good memory of the day of the event that led to

16   the criminal charges.  (*Id.*)  Additionally, Lopez-Ozuna could not recall specifics about

17   medications that he had been previously prescribed.  (*Id.*)  Dr. Johnson explained that when

18   he noted that Lopez-Ozuna's memory issues were "not too extreme," he meant that Lopez-

19   Ozuna was able to answer the majority of questions and did not say that he did not

20   remember or know something.  (*Id.*)  Dr. Johnson did not do any memory testing because

21   "it was not necessary."  (*Id.* at 63–64.)

22       Dr. Johnson confirmed that a "good portion" of his report is focused on Lopez-

23   Ozuna's understanding of the legal process.  ((Doc. 113) at 64.)  Dr. Johnson did not

24   explain the legal system to Lopez-Ozuna prior to determining that he understood the legal

25   system.  (*Id.* at 65.)  Again, there were a couple areas "that [Lopez-Ozuna] did not bring

26   up on his own and did not understand[,]" but Dr. Johnson helped him understand those

27   areas.  (*Id.*)  Dr. Johnson noted in his report that Lopez-Ozuna could describe the events

28   that happened at the time of his offenses even though he claimed to not have any memory

from the time of the accident up to waking up in the hospital. (*Id.* at 64.) Dr. Johnson reiterated that Lopez-Ozuna did have a memory of many things that happened "up to the point of the accident." (*Id.*)

Dr. Johnson did not do any testing on memory retention. ((Doc. 113) at 65.) Dr. Johnson did not express concern regarding Lopez-Ozuna's ability to retain information, because "his understanding of the court he brought up on his own[,] [and] therefore, there was not a need to retest that[.]" (*Id.*) Dr. Johnson further observed that "[t]he couple areas Lopez-Ozuna struggled with were more minor things." (*Id.*) Dr. Johnson "did not re-ask" Lopez-Ozuna about those minor things because they were not "major issues[,] [and] [h]e was easily educated on them." (*Id.*) Dr. Johnson further opined that "if they were to impact . . . his legal case, it was obvious he can be re-educated on them at that time." (*Id.* at 65–66.)

Dr. Johnson did not have a follow-up meeting with Lopez-Ozuna because "it's not customary on a competency examination[,]" which are usually a one-time evaluation with an individual. ((Doc. 113) at 66.) If Dr. Johnson was concerned about competency, he could have met with Lopez-Ozuna again and has done so with others he has evaluated. (*Id.*)

Dr. Johnson testified that Lopez-Ozuna described the role of the jury as a group of people that "sit on the side" and "listen to what was said by both sides." (*Id.*) Lopez-Ozuna was able to provide Dr. Johnson with "his version" of the charges. (*Id.* at 67.) Dr. Johnson observed that "[t]hey were not word for word, but . . . actually were in line with what the actual charges are." (*Id.*)

Dr. Johnson testified that Lopez-Ozuna's ability to assist counsel was "something . . . more indirect throughout the evaluation that one would assess[,]" rather than a specific line of questioning. ((Doc. 113) at 67.) Dr. Johnson added, "I'm not sure how I would ask him how he can assist counsel quite in that way[;] [i]t is something to see how . . . they are interacting with you and how they're able to describe things, how they're able to answer questions[,] . . . [and] if they can do it . . . with me during the evaluation, they're able to

do that with their attorney." (*Id.*)  Dr. Johnson acknowledged that "an attorney is doing many different things with the client than a psychologist spending 90 minutes with them[.]" (*Id.*)  He also agreed that the ability to assist counsel is more than just behaving and cooperating. (*Id.* at 67–68.)

Dr. Johnson also acknowledged that memory and language skills are important to assisting counsel "to a degree." (*Id.* at 68.)  Dr. Johnson explained that a person can have problems with their ability to communicate and still have the ability to work with their attorney. ((Doc. 113) at 68.)  Dr. Johnson testified that Lopez-Ozuna "did struggle a little bit with his memory on some small things[,] [but it was] [n]ot a major issue[,] [a]nd as far as his ability to communicate, he used a simple vocabulary[,] [and] . . . was somewhat concrete in his descriptions and in his communications." (*Id.*)

Dr. Johnson agreed with Dr. Weller that "intact ability and cognition" can be an important part of the ability to assist counsel. (*Id.* at 69.)  Dr. Johnson also recognized that ability and cognition include a person's capacity to understand and exercise rational thought, and could include the ability to consider specific decisions and their consequences. (*Id.*)

Dr. Johnson did not perform any testing on receptive and expressive vocabulary, or on attention, memory, and learning. (*Id.* at 70.)  Regarding formal testing of these areas, Dr. Johnson observed, "Well, one is talking about formal testing versus being able to assess[,] [a]nd as I assessed him psychiatrically through the evaluation, . . . I did see his abilities to do those things." ((Doc. 113) at 71.)  As a result of his observations and evaluation, Dr. Johnson did not feel that referring Lopez-Ozuna to a neuropsychologist would have been helpful in determining competency. (*Id.*)  Dr. Johnson testified that based on his assessment of Lopez-Ozuna, he believes that Lopez-Ozuna has the ability to work with his attorney. (*Id.*)  Dr. Johnson observed that Dr. Weller "talked about having abstract abilities to pick up on nuances[,] [which] is not part of competency." (*Id.*)  As a result, Dr. Johnson "did not take it to that degree." (*Id.*)

Dr. Johnson noted that concentration and focus are some of the main symptoms of

ADHD, and acknowledged that ADHD could have an impact on Lopez-Ozuna's ability to concentrate during court proceedings. ((Doc. 113) at 72.) Dr. Johnson also acknowledged that ADHD might impact his ability to concentrate and focus during meetings with counsel. (*Id*.) However, he testified that although lower cognitive functioning might interfere with the ability to assist counsel, it is not necessarily the case. (*Id.* at 72–73.) Dr. Johnson reiterated that there was nothing in Dr. Weller's testing or her report that altered his opinion that Lopez-Ozuna is competent. (*Id.* at 73.) Dr. Johnson emphasized that "[b]ecause of the low bar that one needs to meet for competency," Dr. Weller's additional information does not change his opinion. (*Id.*)

Dr. Johnson reiterated that the Folstein Mini-Mental Status Examination ("MMSE") "has nothing to do with competency." ((Doc. 113) at 73.) Dr. Johnson acknowledged that the MMSE does not account for minor cognitive issues, memory issues, vocabulary or attention deficits, or learning capacity. (*Id.* at 79–80.) Dr. Johnson emphasized that "[i]t is simply a screening evaluation for more severe cognitive or dementia-type problems[,] [and] [t]hat was all that it was used for in this case." (*Id.* at 73.) Dr. Johnson did not have any concerns about Lopez-Ozuna having either of these issues. (*Id*.)

Dr. Johnson again testified that he "did not feel that there was other testing that was necessary." (*Id.* at 74.) He explained that he conducted the competency evaluation "from a more psychiatric standpoint, not from a neurological standpoint." ((Doc. 113) at 74.) Dr. Johnson further explained that the two (2) disciplines "conduct these types of evaluations often differently." (*Id*.) Dr. Johnson testified that although the IQ test administered by Dr. Weller helped with her diagnosis of Lopez-Ozuna, "it was not necessary for competency because competency is a legal issue, . . . not a psychiatric diagnostic issue." (*Id.* at 80.)

Dr. Johnson agreed that a person's reading and writing ability might impact a person's ability to assist counsel. (*Id.* at 81.) He was aware that Dr. Weller's testing revealed that Lopez-Ozuna has "some limitations" in those areas. (*Id*.) Dr. Johnson also agreed that Lopez-Ozuna's reading and writing difficulties might be consistent with learning difficulties and a need for special education in school. ((Doc. 113) at 81.) He

1   acknowledged that ADHD and borderline intellectual functioning might interfere with an

2   individual's ability to remember information.  (*Id.* at 82.)  With regard to not including

3   these specific diagnoses in his evaluation, Dr. Johnson observed:

> I'm not sure what there was to analyze.  I know he had some educational
> problems.  He told me that . . . he had ADHD symptoms.  I knew that that
> was a possibility.  But again, this did not have the impact of changing his
> competency.  He is still competent to stand trial, despite having those
> problems.

(*Id.* at 82–83.)

9   Dr. Johnson confirmed that his report notes that Lopez-Ozuna "had occasional

10  difficulty with memory."  (*Id.* at 84.)  Dr. Johnson testified that he did not see or "pick up

11  anything that led [him] to conclude that [Lopez-Ozuna] had significantly below average

12  intelligence."  (*Id.*)  Dr. Johnson explained that "without testing, it's very difficult to render

13  just a guess as to what one's IQ is[,] [b]ut there are times when you could meet with an

14  individual who may have, for example, a very profound intellectual disability[,]" where it

15  is "fairly obvious that there's a problem."  ((Doc. 113) at 84–85.)  When asked if Lopez-

16  Ozuna's IQ score changed his opinion that he is below average intelligence, Dr. Johnson

17  testified that "it was obvious that he had some limitations," so the IQ score "seemed

18  consistent with the way that he presented to me, just clarified better."  (*Id.* at 85.)

19                          3.   Re-Direct Examination

20  Dr. Johnson reiterated that there is not a specific test to assess competency using the

21  *Dusky* standard and observed that if such a test existed, it would be used in every case.

22  ((Doc. 113) at 90.)  Dr. Johnson noted that ADHD can be treated with medication and

23  fatigue at trial could be dealt with by taking more frequent breaks.  (*Id.*)

24  Lopez-Ozuna told Dr. Johnson that he had lost consciousness after the accident until

25  he awoke in the hospital.  (*Id.* at 90–91.)  Dr. Johnson agreed that the medical records

26  referenced by Dr. Weller were "unclear about loss of consciousness[.]"  (*Id.* at 91.)  In Dr.

27  Johnson's experience, if a person "lost consciousness for a period of time, for example,

28  during a hospitalization, that would be noted" in the medical reports.  (*Id.*)

A video was played which showed Lopez-Ozuna and other individuals who were injured lying on the side of the road and being attended to by law enforcement. ((Doc. 113) at 91–97.) Dr. Johnson testified that the video shows Lopez-Ozuna right after the accident; "initially he seemed a little confused, but then . . . he's more sort of oriented as to what's going on." (*Id.* at 97.) Dr. Johnson further testified that Lopez-Ozuna said, "'I'm sorry, I'm sorry,' . . . obviously referring to something that has just happened." (*Id.*) Dr. Johnson observed that Lopez-Ozuna does "lose some consciousness for a short period of time, but then he arouses again after a few seconds and then once again is back to where he is communicating and saying that he is sorry." (*Id.*) Dr. Johnson noted that in another video, Lopez-Ozuna was responsive to questions and said that he was sorry repeatedly. (*Id.*)

Regarding the effect of the video on his competency evaluation, Dr. Johnson testified, "I'm not sure that it helps me one way or another regarding competency[;] [but] [n]o, it doesn't change my opinion." ((Doc. 113) at 97.) Dr. Johnson further testified that even if Lopez-Ozuna had been unconscious the entire time at the scene, Dr. Johnson's opinion that he is currently competent to stand trial would remain unchanged. (*Id.* at 99.) Dr. Johnson explained that "those are issues of his state of mind at the time," whether he had a concussion or other medical issues, "[b]ut if he understands how the court works now and can still work with attorneys now, he's still competent to stand trial." (*Id.*)

Dr. Johnson again confirmed that neither Dr. Weller nor counsel provided him with medical or school records. (*Id.* at 100.) Dr. Johnson testified that Lopez-Ozuna "was able to give me a fairly reasonable history regarding his schooling and medical history[,] [and] [t]he summary of what I've seen of those records didn't change that." (*Id.*) Dr. Johnson further noted, "I'm not going to base competency just based on that history." ((Doc. 113) at 100.) Dr. Johnson explained, "[c]ompetency is regarding [Lopez-Ozuna's] understanding of the court now and his ability to work with his attorney now and whether he can demonstrate those abilities at this point." (*Id.*) Dr. Johnson commented that while "[t]hat other information is helpful, . . . it's not what you base competency on." (*Id.*) Dr.

Johnson reiterated that there is not an "outcome determinative test of competency." (*Id.* at 101.) Dr. Johnson testified that Dr. Weller's conclusion from her testing that Lopez-Ozuna reads at a third-grade level and writes at a fifth-grade level does not "mean much regarding competency[,] [because] [a]gain, competency is a specific legal determination[,] [and] [i]t's not just based on one issue regarding a learning disability or a problem with communication or a problem with reading[.]" (*Id.* at 101–102.) A person need not have the ability to read or write in order to be competent to stand trial. ((Doc. 113) at 101.) In other cases, Dr. Johnson has found "individuals who have . . . even lower cognitive function than Mr. Lopez-Ozuna" competent to stand trial. (*Id.*)

Because Dr. Johnson has concluded that Lopez-Ozuna is competent to stand trial, he obviously does not "see him as needing restoration at this point." (*Id.* at 102.) "[T]he fact that [Lopez-Ozuna] may need to take breaks or have things explained to him does not change [Dr. Johnson's] opinion" that he is competent to stand trial. (*Id.*) Dr. Johnson explained that "those are accommodations that could be made for an[y] individual who may have problems[,] [and such] [a]ccommodations are made like that in court all the time." (*Id.*)

### 4.  Re-Cross Examination

Dr. Johnson agreed that the video depicted that Lopez-Ozuna was injured; however, he testified that it was hard to tell from the video if he had a head injury. (Hr'g Tr. 3/4/2025 (Doc. 113) at 103.) Dr. Johnson assumes that he did "because he reported that he had hit his head[.]" (*Id.*) Dr. Johnson added that the fact Lopez-Ozuna had blood on his head does not necessarily mean he had a head injury because "head injuries are very difficult to [diagnose] just based on looking at someone." (*Id.*) Dr. Johnson observed that the video shows that Lopez-Ozuna lost "consciousness for just a short period" but then regained consciousness. (*Id.*) Dr. Johnson agreed that loss of consciousness is different from loss of memory and confirmed that "someone can have amnesia and not lose consciousness" and "someone can lose consciousness and not necessarily have amnesia." (*Id.* at 103–04.)

1

5.  The Court's examination

2       Dr. Johnson confirmed his opinion that Lopez-Ozuna is competent notwithstanding

3   the medical and educations records, the cognitive testing, and ADHD diagnosis.  (Hr'g Tr.

4   3/4/2025 (Doc. 113) at 106.)  Dr. Johnson would not have conducted his examination any

5   differently if he had the medical and educational records and knew the IQ score and ADHD

6   diagnosis.  (*Id.*)  Dr. Johnson again explained "it was an examination directed toward

7   competency and competency issues[,] [and] [i]f [Lopez-Ozuna] had been found

8   incompetent or if there was something that jumped out" requiring clarification, "it would

9   have been important to push further[,] [b]ut having those additional records was not

10  necessary."  (*Id.* at 106–07.)  Dr. Johnson added that he had the opportunity during his

11  meeting with the prosecutor prior to his testimony to review the records, but he did not

12  have the time to do so.  (*Id.* at 107.)  Dr, Johnson testified that reviewing the records was

13  not going to lead a "better" or "different" conclusion.  (*Id.*)

14      One of the "minor issues" that Dr. Johnson referred to earlier in his testimony was

15  that Lopez-Ozuna "did not bring up on his own the right to an attorney."  ((Doc. 113) at

16  109.)  When Dr. Johnson tried to educate him about that right, however, Lopez-Ozuna

17  quickly cut Dr. Johnson off and said, "'Oh, yeah.  I do remember that.'"  (*Id.*)  The other

18  issue that Dr. Johnson educated Lopez-Ozuna about was the right to a fair trial.  (*Id.*)  Dr.

19  Johnson testified that Lopez-Ozuna did not bring that right up on his own.  (*Id.*)  Dr.

20  Johnson observed that Lopez-Ozuna did not seem to understand the right to a fair trial,

21  although he said he had a right to a trial, the concept of a "fair trial" seemed "a little novel

22  to him." (*Id.*)  Dr. Johnson testified that they talked about this concept and when he asked

23  Lopez-Ozuna a follow-up question about the right to a fair trial, that is when he expressed

24  fear that "he may not have a fair trial because of the complexity of things[,] . . . worried

25  about the outcome of what it could be[,] . . . [a]nd [] wondered if that was going to be fair."

26  ((Doc. 113) at 109.)  Dr. Johnson observed that there were not "mental health problems

27  that were associated with his concern about having a fair trial."  (*Id.*)  Dr. Johnson did not

28  go into the legal principles that the government must prove guilt beyond a reasonable

doubt, that the defense does not have to present any evidence, or that there must be "a unanimous verdict for a finding of guilty or not guilty." (*Id*. at 110.) They did not specifically discuss a defendant's right to testify or not to testify, or that the jury cannot consider the fact that a defendant did not testify when deciding guilt. (*Id*.) Dr. Johnson testified that "[w]e didn't go to that degree[,] [b]ut [Lopez-Ozuna] understood that he didn't need to speak to anybody, [that] was what he talked to me about[,] [a]nd that he would have an attorney help him with that process." (*Id*.) Dr. Johnson did not ask Lopez-Ozuna to identify the "pros or cons" about testifying or not testifying or pleading guilty or going to trial, as they did not discuss those concepts "to that degree." ((Doc. 113) at 110–11.)

Dr. Johnson confirmed that ADHD can be treated with medication. (*Id*. at 111.) With respect to whether Lopez-Ozuna would benefit from in-patient restoration if he were found to be incompetent, Dr. Johnson reiterated that he does not "see him needing restoration[,] [b]ut if [Lopez-Ozuna] was determined [to be incompetent and]. . . he was sent to a restoration program, he would benefit from that type of programming." (*Id*.) Dr. Johnson added that restoration programs "are able to help many individuals" and many of the individuals that go through them are "restored to competency, including those that have cognitive problems." (*Id*. at 111–12.)

Dr. Johnson testified that he has had cases in the past where he has concluded that a person understands the nature of the proceedings and the criminal process but cannot assist in their defense. (*Id*. at 112.) He described that situation as "fairly common[,]" and commonly involve individuals who are "psychotic at the time" and their psychosis is preventing them from logically working with their attorney to help put their defense together. ((Doc. 113) at 112.) Dr. Johnson observed that is a different scenario "than what we're seeing in this case." (*Id*.)

Regarding whether Lopez-Ozuna would "just defer to whatever his attorneys decide" or had the ability to "push back," Dr. Johnson testified, "That's always difficult to tell when you're not the attorney working with him." (*Id*. at 113.) He added that Lopez-

1  Ozuna said that he trusted his attorney and "liked what his attorney was doing at this point
2  . . . on his case[,] and did not raise anything that his attorney had done that he disagreed
3  with. (*Id.*)

### 6.  Follow-Up Examination by Defense Counsel

5      At a meeting with prosecutors two (2) days prior to his testimony, Dr. Johnson did
6  not ask to see Lopez-Ozuna's medical or educational records.  (Hr'g Tr. 3/4/2025 (Doc.
7  113) at 115.)  He testified that "we discussed whether it would be beneficial for me to spend
8  time to review them and determined that it was not necessary[,] [because] [i]t would not
9  change my opinion at this point."  (*Id.*)  Dr. Johnson reiterated that he was aware of the
10  contents of the records from Dr. Weller's report which summarized them.  (*Id.*)  Dr.
11  Johnson again testified that the records themselves "were not necessary for the competency
12  assessment at that point" and they did not change his opinion.  (*Id.*)

13     Dr. Johnson clarified that did not testify on direct examination that someone with
14  cognitive impairments like Lopez-Ozuna can always assist their attorney "as long as
15  they're not psychotic" or that a person who is "polite and chatty" and not presenting as
16  psychotic can always assist their attorney.  (*Id.* at 116.)  Dr. Johnson explained that there
17  are individuals whose cognitive impairments are so severe that it is obvious that they
18  cannot assist their attorneys.  ((Doc. 113) at 117.)  He observed that an individual "with a
19  borderline intellectual function generally is able to work with their attorney[,] [t]hat is not
20  low enough that one would generally be concerned."  (*Id.*)  Dr. Johnson added that "it could
21  depend on the situation and the case[,] [s]o I can't give you an answer that's going to apply
22  across the board."  (*Id.*)

### A.    Testimony of Dr. Jennifer Weller

#### 1.  Direct Examination

25     Dr. Weller is a clinical psychologist and a neuropsychologist.  (Hr'g Tr. 3/4/2025
26  (Doc. 113) at 120.)  She obtained a doctoral degree in clinical psychology from Arizona
27  State University in 2000, became licensed in 2001, and completed a postdoctoral
28  fellowship in neuropsychology in 2001.  (*Id.*)  After obtaining her license, she worked for

the District Medical Group which is a group of physicians and healthcare providers.  (*Id*.)
With District Medical Group, she "worked in a locked inpatient psychiatric hospital setting
for people who were Court ordered for psychiatric evaluations and Court ordered
treatment."  (*Id*.)  She left in 2022, after twenty-three (23) years, "to pursue full-time private
practice."  (*Id*.)

Dr. Weller took her first forensic case in approximately 2009.  (Hr'g Tr. 3/4/2025
(Doc. 113) at 120.)  Dr. Weller estimated that she has consulted on approximately 400
forensic cases, 32 of which were federal cases.  (*Id*. at 121.)  Dr. Weller has "testified in
numerous competency hearings" and "attended competency and restoration conferences
put on by the Arizona Supreme Court several times, most recently in 2023."  (*Id*.)  She
described those conferences as providing "updated training for anybody who wants to be
qualified to be a Court appointed Rule 11 evaluator."  (*Id*.)  Dr. Weller does not take Court
appointments, but she finds the conferences helpful.  (*Id*.)

Dr. Weller confirmed that she is qualified to conduct psychological and
neuropsychological testing and diagnose individuals with mental disorders.  (Hr'g Tr.
3/4/2025 (Doc. 113) at 121.)  Dr. Weller described neuropsychology as "the study of brain
behavior relationships."  (*Id*. at 122.)  She explained that "[n]europsychologists focus on
questions related to how the brain affects our thinking and our behavior."  (*Id*.)  Dr. Weller
further explained that "[n]europsychologists typically administer a battery or a group of
neurocognitive tests designed to examine multiple aspects of cognition."  (*Id*.)  Dr. Weller
added that neuropsychologists perform "a fairly in-depth clinical interview of the
individual[,]" and if possible, "review collateral sources of information or maybe even
meet with collateral reporters who can provide us with information about the individual
undergoing an evaluation."  (*Id*.)  Dr. Weller described the testing as "designed to be as
objective as possible[,] [and] [t]he tests are typically administered using a test manual that
provides word for word instructions for each test and then scoring criteria for each of the
answers."  (Hr'g Tr. 3/4/2025 (Doc. 113) at 122.)

Dr. Weller noted that "[p]sychiatrists are medical doctors[,] . . . [whose] focus is

very much on medical issues and how a person's physiology plays a role in manifestations of mental health or mental illness." (*Id*. at 123.) By contrast, "a psychologist or neuropsychologist usually has a Ph.D. or a Psy.D," and they focus "on cognitions and behavior and how the brain affects our ability to make choices and think through issues and solve problems." (*Id*.) Dr. Weller testified that "a comprehensive neuropsychological evaluation almost always includes a test of intellectual functioning." (*Id*.) It may also include a test of academic achievement, as well as "tests of attention, concentration, memory, executive functioning, processing speed, and other components of cognition." (*Id*.) Dr. Weller explained that unlike an MRI, which provides a structural image of the brain, neuropsychological testing is not invasive; it involves "putting the person through a series of paper and pencil tasks or tasks on the computer and asking them to perform those tests." (Hr'g Tr. 3/4/2025 (Doc. 113) at 124.)

Dr. Weller confirmed that she has taken referrals from psychiatrists. (*Id*.) Common reasons for referrals include "head injuries, a severe medical illness with long-lasting consequences, maybe some of which are neurological in scope, and sometimes to rule in or rule out particular diagnoses that a psychiatrist doesn't have the training to be able to diagnose[.]" (*Id*. at 125.) "Psychiatrists are not trained in how to administer intelligence tests or academic achievement tests" which are required to diagnose a "specific learning disorder with impairment in reading, mathematics, or written expression." (*Id*.) For that reason, a psychiatrist who has a question about the presence of a specific learning disorder, ADHD, or a traumatic brain injury would refer that patient to a neuropsychologist for evaluation. (*Id*. at 131.)

Dr. Weller expressed her belief that neuropsychological testing is "most helpful for assessing a person's ability to assist counsel, rather than assessing general legal knowledge." (Hr'g Tr. 3/4/2025 (Doc. 113) at 131.) Dr. Weller opined that "there are several domains of cognitive function that are critical when it comes to competency[.]" (*Id*.) These domains include auditory attention, visual attention, memory, reasoning abilities, and language skills – both receptive and expressive language skills. (*Id*. at 132.)

Dr. Weller defined "auditory attention" as "a person's ability to pay attention to what they hear." (*Id.*) She noted that "auditory attention with respect to competency is probably the gatekeeper" to cognitive functioning. (*Id.*) Dr. Weller opined that if a person is unable to focus and sustain "their attention over time, then it makes all the other cognitive functions potentially problematic." (Hr'g Tr. 3/4/2025 (Doc. 113) at 132.) She further opined that "if auditory attention is impaired, it can create problems for a person's competency." (*Id.*) Dr. Weller also opined that auditory attention is important in a legal setting because "[m]ost of the communication that goes on between defense counsel and the client is presented in an auditory format[.]" (*Id.* at 132–33.) She testified that this is also true in a courtroom, where even if there are visuals used for demonstration, "there's usually an auditory component that goes along with the visual." (*Id.* at 133.)

Dr. Weller defined "verbal comprehension" as having "to do with a person's receptive language abilities." (*Id.*) She testified that "if the client cannot understand or comprehend what people are saying to him," whether it is their attorney or other players in the courtroom, "there is a risk for misunderstanding what is presented or a risk for missing it entirely." (Hr'g Tr. 3/4/2025 (Doc. 113) at 133.)

Dr. Weller opined that "[m]emory is necessary for all kinds of things related to competency to stand trial." (*Id.*) She explained that it is related to a person's ability to recall: (1) the charges; (2) the reason for the charges; (3) information that defense counsel provides about their case or legal strategy; (4) how the court system works; and (5) key legal concepts. (*Id.* at 133–34.)

Dr. Weller defined "abstract reasoning" as referring to "identifying patterns and thinking at a higher level[.]" (*Id.* at 134.) Dr. Weller noted this "implies that you can take what you know and generalize it to other situations, or in the case of competency, that you can apply it to your own case." (*Id.*)

Dr. Weller defined "receptive vocabulary" or "receptive language" as referring to "what you are able to understand when someone speaks to you or when you read something." (Hr'g Tr. 3/4/2025 (Doc. 113) at 134.) Dr. Weller defined "expressive

vocabulary" or "expressive communication" as referring to "the words and the knowledge that you have, [and] your ability to express that information about your own thoughts and ideas[.]" (*Id.* at 134–35.)

Dr. Weller testified that there are different neuropsychological tests to assess these areas of cognitive functioning. (*Id.* at 135.) She further testified that compared with psychiatric examination, neuropsychological testing is "just a different way of going about getting the answers to the questions." (*Id.*) Dr. Weller explained that she is "looking for the prerequisite cognitive functions to be intact that would allow a person to answer the questions . . regarding competency[,]" including "a person's ability to assist counsel and to participate meaningfully in their own defense." (*Id.*) A psychiatrist does not conduct neurocognitive testing so they do not have the same range of tests at their disposal "to understand the core or underlying cognitive prerequisites" for competency. (Hr'g Tr. 3/4/2025 (Doc. 113) at 135–36.)

Dr. Weller explained that neuropsychologists do not just conduct one test; they conduct "a range of tests, some of which overlap with other tests so that [they] can look for patterns of performance across all of these different tests." (*Id.* at 136.) Dr. Weller further explained that "[n]europsychologists try to find out the person's pattern of performance in thinking, reasoning, knowledge, insight, judgment and decision making[.]" (*Id.*) Dr. Weller administers most of the same tests for every evaluation. (*Id.*) However, she does "remove some tests if the referral question is incredibly targeted to one or two aspects of cognition"; conversely, she may do supplemental testing if "something is discovered in the initial evaluation that requires additional exploration." (*Id.* at 136–37.)

Dr. Weller testified that her test battery includes those that screen for malingering, motivation, and effort. (Hr'g Tr. 3/4/2025 (Doc. 113) at 137.) Dr. Weller opined that this is important in a forensic case because "there is usually a lot at stake[,] [a]nd it's not unusual for people to try to malinger either cognitive deficits or psychiatric symptoms for the purpose of external incentives or secondary gain." (*Id.* at 137–38.)

Dr. Weller defined "masking" as the opposite of malingering—it refers to a person

attempting to make themselves look more intelligent than they truly are or are doing fine, even though "they are suffering from clinically significant depression or anxiety." (*Id.* at 138–39.) Dr. Weller explained that masking is not an unusual behavior; in the forensic context, it usually involves "somebody who is lower functioning, trying to make themselves appear as though they are higher functioning." (*Id.* at 139.) Masking behavior is more noticeable with experienced mental health providers. (*Id.*) Dr. Weller opined that "[n]eurological testing is particularly useful in identifying a person's true abilities, rather than overestimating their actual skills." (Hr'g Tr. 3/4/2025 (Doc. 113) at 140.) She noted that "[i]t's a lot harder to do better on a neuropsychological test than you're actually capable of doing based on the status of your brain function." (*Id.*)

With respect to the first prong of the legal test for competency, Dr. Weller looks at the person's ability to understand the nature of the charges, "how they came about," "their knowledge of the legal system," and "their understanding of the roles of the key players in the courtroom." (*Id.* at 141.) Dr. Weller explained that "[t]he second prong focuses much more on a person's ability to assist counsel, to have a rational and factual understanding of . . . their case and how they can assist in their own proceedings." (*Id.* at 141–42.) Dr. Weller estimated that she spends about sixty (60) percent of her time with the patient on the first prong, and forty (40) percent of her time on the second prong. (*Id.* at 142.)

Dr. Weller noted that "[d]ifferent neuropsychological tests address the concept of abstract reasoning in different ways." (Hr'g Tr. 3/4/2025 (Doc. 113) at 143.) Dr. Weller observed that "[t]he ability to think and reason in an abstract way is closely tied to the construct of intelligence." (*Id.*) She further opined that "[i]t is unlikely that you could significantly improve a person's abstract reasoning abilities." (*Id.*) Dr. Weller qualified, however, "that there are some strategies you might be able to provide a person that might help them a little bit with higher level reasoning." (*Id.* at 144.) Dr. Weller further noted that "[t]he only issue" was whether the person could remember those strategies, "apply them with fidelity," and know when to apply them. (*Id.*) Dr. Weller testified that language skills are acquired at a "very young age, typically by listening and paying attention to one's

environment." (Hr'g Tr. 3/4/2025 (Doc. 113) at 144.)  Dr. Weller further testified that there are some biological underpinnings for being primed for language, but language development does not occur in a vacuum. (*Id*.)

Dr. Weller disagreed with Dr. Johnson that "competency is a low bar[.]" (*Id*. at 145.) Her opinion is that competency "is a fairly sophisticated construct." (*Id*.) Dr. Weller testified that she spent twelve (12) hours with Lopez-Ozuna; seven (7) of the twelve hours were spent on neuropsychological testing. (*Id*. at 147; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 2.)  She met with him on four different occasions:  October 31, 2024; November 7, 2024; January 9, 2025; and January 16, 2025. ((Doc. 113) at 148–49; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 2.) Dr. Weller opined that four (4) visits were necessary because Lopez-Ozuna "had diminished stamina[,]" which included diminished cognitive and physical stamina, as well as a diminished ability to sustain his cognitive effort. ((Doc. 113) at 148.) Dr. Weller observed that "[t]here were days when he appeared fatigued immediately"; "[t]here were other days where he actually started off relatively awake and able to focus, but then became increasingly restless and uncomfortable"; and there was another day when "he fell asleep during a test of sustained attention." (*Id*. at 149–50.) Dr. Weller found that meeting four (4) times was helpful; she avoids completing a test if she does not believe she is getting full effort for whatever reason— *e.g*., side effects of medication, lack of sleep, or resistance. (*Id*. at 150.)

Dr. Weller agreed with Dr. Johnson that "the client's ability to participate" during the competency evaluation "is one potential source of information about their ability to interact with, understand, and engage with another person." (*Id*.) Dr. Weller qualified this agreement, noting that a person's ability to relate to the doctor in the context of a competency evaluation "is not the same as what that client would have to do in meetings with defense counsel and in the courtroom." (*Id*. at 150–51.) Dr. Weller acknowledged a correspondence between those two situations, but opined that they are not identical. ((Doc. 113) at 151.) Dr. Weller acknowledged that "[a]s a neuropsychologist, [she] believe[s] that the data that [she] collects about a person's cognitive functions and their ability to answer

1  questions in a meaningful way, in a careful way, and in a thorough way is far more
2  important than their ability to relate to me as a person." (*Id*.)

3      In preparation for an evaluation, Dr. Weller reviews records that are available
4  because they provide her with "very valuable historic data" about a person that she "may
5  not necessarily be able to obtain from a client him or herself[.]" (*Id*. at 142.) Prior to her
6  evaluation of Lopez-Ozuna, she reviewed his school records and the medical records from
7  community hospitals and CoreCivic mental health, as well as the indictment and police
8  reports. (*Id.* at 151; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 2.)

9      Dr. Weller testified that her first meeting with Lopez-Ozuna on October 31, 2024,
10  included telling him the reason she was hired, gathering background and historical
11  information, and "some testing of the specific cognitive domains that contribute to
12  competency in [her] opinion." ((Doc. 113) at 152; *see also* Dr. Weller's Psych. Eval.
13  2/13/2025.) Her initial testing of Lopez-Ozuna included: the receptive one-word picture
14  vocabulary test; the expressive one-word picture vocabulary test; two tests for malingering
15  to determine effort and possible exaggeration of symptoms; a test to measure his anxiety
16  for assessing whether anxiety played a role in neurological test results; two tests of
17  performance validity to make sure he was putting forth good effort; and the Inventory of
18  Legal Knowledge test. (*Id.* at 153–54.) Dr. Weller explained that the Inventory of Legal
19  Knowledge test "is not an assessment of how much you know about the legal system[,]
20  [but] . . . is designed to show if someone is feigning a lack of knowledge when it comes to
21  the legal setting." (*Id*. at 154.)

22      Dr. Weller characterized the first two meetings with Lopez-Ozuna on October 31,
23  2024 and November 7, 2024, as "focused on the competency related questions for each
24  prong of *Dusky* and obtaining some background information about his life and history to
25  give [Dr. Weller] some context for the evaluation." (*Id*. at 155; *see also* Dr. Weller's Psych.
26  Eval. 2/13/2025.) Dr. Weller testified that Lopez-Ozuna appeared fatigued at most of the
27  meetings, and he fell asleep during a test even though Dr. Weller "tried to rouse him several
28  times." ((Doc. 113) at 155; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 31.) Dr. Weller

described Lopez-Ozuna as cooperative in that he performed tasks that he was asked to perform.  ((Doc. 113) at 155; *see also* Dr. Weller's Psych. Eval. 2/13/2025.)  She testified that Lopez-Ozuna was not obstructionist, rude, disrespectful, or difficult in any way; "[h]e seemed to want to please."  ((Doc. 113) at 155–56.)  Dr. Weller observed that Lopez-Ozuna's "demeanor was somewhat immature for his age" and he "seemed to tire quickly as well as showing fidgeting and discomfort."  (*Id*. at 156.)  Dr. Weller described Lopez-Ozuna's sleepiness and fatigue in court during the hearing as "fairly similar" to what occurred in their meetings.  (*Id*.)  Dr. Weller explained that "[i]nitially, or for short bursts of time, he can engage himself[,] . . . focus on a task[,] [and] . . . even speed up on a task" if prompted to do so.  (*Id.*)  Dr. Weller opined, however, that "he can't sustain that level of effort for very long, sometimes not even minutes before his speed of performance slows down, before he appears fatigued or restless or disengaged."  (*Id.*)

Dr. Weller described Lopez-Ozuna's effort on tests as fine and within normal limits.  ((Doc. 113) at 156; *see also* Dr. Weller's Psych. Eval. 2/13/2025.)  Dr. Weller reported that "[h]e did not score in the elevated range on any of the tests of malingering or effort or motivation."  ((Doc. 113) at 156; *see also* Dr. Weller's Psych. Eval. 2/13/2025.)  Dr. Weller observed that Lopez-Ozuna's inability to sustain his cognitive effort did not appear volitional.  ((Doc. 113) at 156.)  She testified that because there was no indicia of malingering or lack of effort, the results of the scores of the other tests "are considered valid and reliable[.]"  ((Doc. 113) at 157; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 14, 32.)

Dr. Weller reported that Lopez-Ozuna "scored in the below average range for receptive vocabulary, what he understands, and he scored in the exceptionally low range on the test of expressive vocabulary."  ((Doc. 113) at 157; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 38.)  Lopez-Ozuna's scores on both tests were "at the second percentile, which means that 98 percent of people his age score higher" on these tests than he did.  ((Doc. 113) at 158; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 38.)  With respect to interacting with his attorneys or answering questions, Dr. Weller opined that Lopez-

Ozuna's "limited receptive vocabulary would interfere with his ability to understand what people were trying to communicate with him[,] [a]nd his limited expressive vocabulary would interfere with his ability to express his own thoughts and ideas and the answers to . . . questions in words." ((Doc. 113) at 158.)  Dr. Weller testified that she "would expect someone with this pattern of vocabulary test scores to not understand a lot of what is being communicated."  (*Id.* at 158.)  She added that some clients are comfortable in "speaking up and asking for clarification" because they do not understand a question and other clients are not comfortable doing so and engage in masking behavior.  (*Id.* at 158–59.)  Dr. Weller opined that if Lopez-Ozuna was not willing to tell defense counsel that he did not understand something, it would be difficult for counsel to assess whether he in fact understood.  (*Id.* at 159.)  She further opined that "[i]t would also affect his ability to formulate a verbal response" to counsel.  (*Id.*)  Dr. Weller posited that Lopez-Ozuna might answer the question incorrectly or use the wrong word to express himself which could be "potentially very misleading and sometimes even harmful when attorneys are trying to elicit important information" from him.  ((Doc. 113) at 159.)

Dr. Weller reported that Lopez-Ozuna scored within normal limits on the tests used to assess malingering of memory or psychiatric symptoms.  (*Id.*; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 32.)  Dr. Weller noted that Lopez-Ozuna reported elevated symptoms of anxiety on the Beck Anxiety Inventory.  ((Doc. 113) at 159; *see also* Dr. Weller's Psych. Eval. 2/13/2025.)  Dr. Weller further reported that Lopez-Ozuna scored within normal limits on the Dot Counting test, which assesses effort, and scored well within normal limits on the Inventory of Legal Knowledge.  ((Doc. 113) at 160; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 31–32.)

Dr. Weller reiterated that she found Lopez-Ozuna's school and medical records helpful.  ((Doc. 113) at 160.)  The school records reflect that Lopez-Ozuna was "identified as an English language learner" in about the first grade.  (*Id.*)  Dr. Weller observed that at that time, Lopez-Ozuna "scored at the basic level . . . meaning his English skills were not commensurate with those of his same age and same grade peers."  (*Id.*)  Dr. Weller noted

that by the fourth grade Lopez-Ozuna had moved up to the intermediate level, which is still not considered a sufficient level of English language communication. (*Id.* at 161.) Dr. Weller testified that "[t]he school records also showed a fairly extensive history learning difficulties as well as problems with attention and behavior in the classroom[.]" (*Id.*) Dr. Weller noted that a teacher identified Lopez-Ozuna as someone who had trouble staying focused in the classroom and who engaged in impulsive behaviors. ((Doc. 113) at 161.) The school records did not reflect that Lopez-Ozuna was referred to a school psychologist. (*Id.*) Dr. Weller noted that Lopez-Ozuna was "never evaluated for ADHD, diagnosed with it, or provided any treatment options for it." (*Id.* at 161–62.) Dr. Weller testified that there were no special education records within the school records. (*Id.* at 162.) Dr. Weller opined that the best evidence in the school records of Lopez-Ozuna's "unmet learning needs" is reflected in standardized test scores which were below average or "minimally proficient, almost without exception." (*Id.* at 162–63.) The records reflect that Lopez-Ozuna did not graduate from high school. ((Doc. 113) at 162.) Dr. Weller opined that Lopez-Ozuna's below average or compromised academic performance noted in the school records was consistent with the results of the cognitive tests she conducted. (*Id.* at 164.)

Dr. Weller testified that Lopez-Ozuna's medical records gave her "a lot more information than [sh]e would have had about the nature of the 2023 car accident in which he struck his forehead and developed a large contusion and a cut, as well as other orthopedic injuries." (*Id.* at 163.) She further testified that the chiropractic and sports medicine records allowed her to see what kind of treatment he was offered and how his symptoms responded to treatments. (*Id.* at 163–64.) It was clear to Dr. Weller from the medical records that "Lopez-Ozuna had to make significant changes to his life after the 2023 accident, such that he had to request more help in school and receive some academic accommodations after that injury[,] had to cut back on his work hours, on his athletic activities, and had to avoid sources of heat or potential head injury areas in the workplace." (*Id.* at 164.) Dr. Weller testified that "knowing that he had two . . . head injuries within about a year of time was particularly important for my assessment of both his competency

1    and his neuropsychological functioning because it let me know that there was a chance that

2    Mr. Lopez-Ozuna had not completely recovered from the first head injury in 2023 at the

3    time he sustained the second head injury in 2024." ((Doc. 113) at 164–65.)  Dr. Weller

4    opined that the test results "were consistent with a brain that was clearly struggling to

5    perform certain kinds of cognitive tasks."  (*Id.* at 165.)

6        After the second meeting with Lopez-Ozuna on November 7, 2024, Dr. Weller told

7    defense counsel about her "concerns about potential cognitive limitations."  (*Id.*)  At that

8    point, it was decided that Dr. Weller would conduct "complete neuropsychological

9    evaluation."  (*Id.*)  Dr. Weller opined that the advantage of that evaluation was she was

10   able to test intellectual functioning so Lopez-Ozuna's intelligence could be quantified, "not

11   just overall, but in the five specific domains that contribute to intelligence."  (*Id.* at 165–

12   66.)

13       Dr. Weller administered the Wechsler Adult Intelligence Test to Lopez-Ozuna.

14   ((Doc. 113) at 166; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 32–37.)  Dr. Weller

15   explained that the test gives a "full scale IQ score, which refers to overall intelligence," but

16   it also gives information about the "five different components that contribute to the

17   construct of intelligence."  ((Doc. 113) at 166–67.)  Dr. Weller listed the composites as

18   verbal comprehension; visual/spatial; fluid reasoning; working memory; and processing

19   speed.  ((Doc. 113) at 167; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 32–37.)  Dr.

20   Weller expressed her belief that verbal comprehension, working memory, and processing

21   speed are the components particularly important for competency.  ((Doc. 113) at 167.)  Dr.

22   Weller testified that Lopez-Ozuna's lowest composite scores were in these three

23   components.  (*Id.* at 168; *see also* Dr. Weller's Psych. Eval. 2/13/2025.)  Lopez-Ozuna

24   "scored in the low average range on fluid reasoning and in the average range on the

25   visual/spatial composite."  ((Doc. 113) at 168; *see also* Dr. Weller's Psych. Eval. 2/13/2025

26   at 32–37.)  Dr. Weller explained that his verbal comprehension score of 76 falls into the

27   borderline or "the below average range and at the fifth percentile compared to same age

28   peers."  ((Doc. 113) at 168; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 33.)  Dr. Weller

further testified that Lopez-Ozuna's working memory score of 70 "falls at the low end of the borderline range and at the second percentile compared to peers." ((Doc. 113) at 168; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 33.) His "processing speed composite score was 74, which is in the borderline or below average range and at the fourth percentile." ((Doc. 113) at 168; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 33.)

Dr. Weller explained that "[t]he full scale IQ score is a weighted average of the five composite scores that contribute to it." ((Doc. 113) at 169; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 32–37.) Dr. Weller reported that Lopez-Ozuna's "full scale IQ score is 78[,] [and] falls at the seventh percentile and in the borderline range of performance." ( (Doc. 113) at 169; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 32–37.) Dr. Weller testified that "[s]omeone with a full IQ score of 78 [has] what is known as borderline intellectual functioning[,] . . . [which] means that the person is not performing at the level of an average or low average individual[,] [but] they're not performing as low as somebody who has intellectual disability[,] . . . they're somewhere in between." ((Doc. 113) at 170.) Dr. Weller explained that borderline intellectual functioning can be caused by a multitude of things, including genetic issues, perinatal problems, biological causes, problems during pregnancy and delivery, and epigenetic factors like maternal stress or lower socioeconomic status. (*Id.* at 171.) She explained that people with borderline intellectual functioning "are at risk or vulnerable to a number of adverse life outcomes." (*Id.* at 170.) She further explained that their adaptive functions – i.e., socialization skills, communication skills, and daily living skills – tend to be lower than their peers. (*Id.*) Additionally, they are at higher risk than peers for certain psychiatric conditions, such as ADHD, learning disorders, anxiety, and depression. (*Id.*)

Dr. Weller acknowledged that an IQ score does not necessarily mean competency versus lack of competency. ((Doc. 113) at 170.) She testified that although "intelligence and competency may be correlated to some degree[,] . . . there is no definitive connection" and it is possible to have a lower IQ score and still be competent to stand trial, or to have a higher IQ score and not be competent. (*Id.* at 170–71.) Dr. Weller explained that for that

reason, neuropsychologists "never rely on the results of one and only one test to understand a person's functional abilities." (*Id.* at 171.)

Dr. Weller also administered a test of academic achievement so she could get a sense of Lopez-Ozuna's reading, writing, and mathematical abilities, and compare those scores to his IQ scores. (*Id.*)  Dr. Weller reported that Lopez-Ozuna's overall academic achievement score was in the lowest range of performance. (*Id.* at 172.) Dr. Weller further reported that he had difficulties in reading, writing, and math. ((Doc. 113) at 172.)  Dr. Weller found Lopez-Ozuna's academic achievement score "consistent with borderline intellectual functioning or even mild intellectual disability." (*Id.*)

Dr. Weller opined that based on his tests scores, Lopez-Ozuna would have needed special education courses in school to be successful academically. (*Id.* at 173.) Dr. Weller believes that "[t]he window of opportunity for [Lopez-Ozuna] learning certain kinds of information" has essentially closed "simply because of [his] age and development." (*Id.*) She also believes that Lopez-Ozuna had the potential to improve some vocabulary, but it is now unlikely he can do so because he is not in an active learning situation. (*Id.*)  He would need academic and special education support to improve his reading, writing, and mathematical abilities. ((Doc. 113) at 173.)

Dr. Weller testified that Lopez-Ozuna also had low scores on tests for memory, attention, executive function, and processing speed. (*Id.* at 174.)  Lopez-Ozuna demonstrated better memory for auditory information than he did for visual information; on tests for attention, he showed problems both for auditory and visual information; on executive function, he performed worse under the stress of being timed to complete the test; and he showed chronically slow processing speed. (*Id.*)

Dr. Weller opined that Lopez-Ozuna's significant impairment in reading and writing would make reading discovery or other materials a significant challenge for him and it should not be done unsupervised. (*Id.* at 175.)  She also opined that Lopez-Ozuna would have difficulty either formulating responses to questions or would be slow in responding to questions. (*Id.*)  Dr. Weller further opined that he would have greater difficulty

functioning in a highly stressful situation and would have trouble sustaining his attention during meetings, as well as remembering information that was talked about at those meetings.  ((Doc. 113) at 175.)  Dr. Weller also opined that Lopez-Ozuna's "relative strengths"—visual/spatial skills—"are not such that would promote an effective way to improve [counsel's] communication with him."  (*Id.* at 176.)

Dr. Weller described executive functions as "things like planning, organizing, self-monitoring while performing a task, thinking abstractly, being cognitively flexible when you're trying to solve a problem, initiating a behavior when you need to, getting started on a task, and inhibition of behavior, stopping yourself from performing a behavior that is undesired or unwanted."  (*Id.* at 177.)  Dr. Weller testified that "[p]eople with impaired executive functions are often very disorganized cognitively."  (*Id.*)  She further testified that "[t]hey may have the information that you want or that you need from them[,] [b]ut it's very difficult for them to organize it and to think of it chronologically and to identify . . . the most important information compared to . . . less important or . . . unnecessary [information].  (*Id.*)  Dr. Weller explained that executive functioning is not "the sole criterion for determining competency; but it is one incredibly important aspect when it comes to competency to stand trial."  ((Doc. 113) at 178.)

Dr. Weller diagnosed Lopez-Ozuna with "ADHD predominately inattentive type." (*Id.*)  Dr. Weller opined that this diagnosis was concerning in the legal context "both because it will affect his ability to attend and sustain his attention during interactions with counsel, and it will greatly affect his ability to attend and stay focused on any legal proceedings."  (*Id.* at 178–79.)  Dr. Weller acknowledged that there are medications for ADHD as well as behavioral or environmental modifications that can be made for people with ADHD.  (*Id.* at 179.)

With respect to the first prong of the *Dusky* standard, Dr. Weller opined that Lopez-Ozuna has "a rudimentary or superficial understanding of some of the legal concepts and the roles of people in the courtroom setting."  (*Id.* at 179–80.)  When Dr. Weller "tried to push underneath that superficial description," Lopez-Ozuna often could not give her

answers, "not so much about the what, but about the why of those constructs." ((Doc. 113) at 180.) Dr. Weller opined that knowing the why is important because you are "getting at abstract reasoning." (*Id.*) Specifically, Dr. Weller testified that "[i]f you ask a person why something is the way it is, you actually get a much clearer understanding of the depth of their knowledge[.]" (*Id.*) Dr. Weller opined that the risk of not "delving deeper" is that "you miss very important information that your client really may not understand what is going on with his case." (*Id.*) Dr. Weller disagreed with Dr. Johnson's view that her questions were "too sophisticated." (*Id.*) She testified that she has never thought of her questions as sophisticated and she is "not content with having a person parrot back to me a legal term or a legal concept. I need to know that they truly understand the concept." ((Doc. 113) at 180–81.)

Dr. Weller estimated that, in general, recovery from a brain injury generally occurs within one (1) year from the date of the injury. (*Id.* at 181.) Dr. Weller noted that it is "potentially very problematic" for a person to have two (2) head injuries within a year because the person may not have recovered from the first head injury. (*Id.* at 182.) Dr. Weller observed that a person with lower intellectual functions or another problem affecting the brain is "at greater risk for negative outcomes" from a head injury. (*Id.*) Dr. Weller posited that the ideal recovery setting for someone with a head injury would include access to cognitive rehabilitation. (*Id.* at 183.) Dr. Weller opined that there are simple things that help recovery such as living in a safe, low stimulation environment with low levels of life stress. ((Doc. 113) at 183.) Dr. Weller found Lopez-Ozuna's current custodial environment at CCA not conducive to recovery from his head injuries. (*Id.* at 184.)

Dr. Weller testified that "[t]he most common example of [a] major neurocognitive disorder is a diagnosis of dementia[.]" (*Id.*) She explained that a diagnosis of a minor neurocognitive disorder "refers to changes in brain function and thinking abilities, but not to a significant level as a major neurocognitive disorder." (*Id.*) She further explained that "[t]he meaning of the word 'mild' in that context means there is clear neurocognitive impairment." (*Id.* at 184–85.) Dr. Weller observed that such impairment may disrupt some

- 58 -

1   instrumental activities of daily living; however, it does not dictate whether someone is

2   competent or incompetent.  ((Doc. 113) at 185.)  Dr. Weller noted that "[i]t depends on the

3   quality of the cognitive impairment and the specific domains that are impaired."  (*Id*.)

4        Dr. Weller opined that Lopez-Ozuna is not competent to stand trial; she is 95 percent

5   certain of her opinion.  (*Id.* at 185-187.)  Dr. Weller's opinion is based on "a constellation

6   of deficits that appear on neurocognitive testing that are most important in assessing

7   competency to stand trial."  (*Id.* at 185–86.)  Dr. Weller believes that there is a difference

8   from having a conversation with Lopez-Ozuna like Dr. Johnson did "versus asking him to

9   perform a variety of cognitive tasks that provide information about his strengths and

10  weaknesses.  ((Doc. 113) at 186.)

11       Dr. Weller acknowledged that it was possible that Lopez-Ozuna may have scored

12  better on the tests "if his general health had been better" or if he had been well-rested at

13  the time of the tests.  (*Id*.)  Dr. Weller testified that seeing Lopez-Ozuna appearing

14  "fatigued across four visits across several months is a little concerning . . . because it

15  mean[t] that either he's not getting sufficient sleep or it may be a residual symptom of his

16  head injuries."  (*Id*. at 186–87.)

17       With respect to the video of the accident scene which showed Lopez-Ozuna

18  conscious and speaking, Dr. Weller testified that there are various explanations why a

19  person "can communicate verbally and can have their eyes open and engage with

20  somebody briefly, but then not remember that interaction later."  (*Id.* at 187–88.)  Dr.

21  Weller noted that the easiest explanation was if the person received "medication

22  immediately after the injuries that may alter their memory of the experience."  (*Id.* at 188.)

23  Dr. Weller posited that another explanation is retroactive amnesia, which is when someone

24  suffers a severe head injury that causes them to "lose memory for a specific period of time

25  prior to the head injury as well as some of the time after that injury."  ((Doc. 113) at 188.)

26       Because of Lopez-Ozuna's lower IQ, his impaired attention, and memory deficits,

27  Dr. Weller does not believe that he "can achieve competency to stand trial in a traditional

28  restoration to competency program."  (*Id*.)  Dr. Weller suggested that he would need "a

special education trained restoration specialist to work with him." (*Id*. at 189.) Dr. Weller does not know if such a specialist exists. (*Id.*) Dr. Weller opined that Lopez-Ozuna would need shorter education sessions, more frequent breaks, and have information repeated to him and reviewed more often with him than an average person because of his attention and memory issues. (*Id.*) Dr. Weller acknowledged that ADHD medication might help as long as he could tolerate it and he could be stabilized on it prior to engaging in restoration. ((Doc. 113) at 189.)

Dr. Weller testified that the fact that Lopez-Ozuna described to Dr. Johnson in some detail how he became involved in the offense does not mean that he is competent to stand trial. (*Id.* at 190.) Dr. Weller explained that the ability to describe events around the time of an incident does not mean that you have a complete understanding of the seriousness of the allegations or the potential consequences of your actions. (*Id.*) She further observed that it does not mean "that you have an appreciation of all potential legal defenses or a comprehensive understanding of how the legal system works[,] [a]nd it certainly has nothing to do with a person's ability to assist counsel in their own defense." (*Id.*)

### 2. Cross-Examination

Dr. Weller disagreed that she testified on direct examination "that the ability to recall events is not important to competency[.]" (Hr'g Tr. 3/4/2025 (Doc. 113) at 191.) Dr. Weller believes the ability to recall events "certainly can be" important for competency. (*Id.*) She added that the ability to recall the events that led to the charges "absolutely can be important for assisting" counsel. (*Id.* at 192.)

Dr. Weller acknowledged that Lopez-Ozuna's medical records related to the 2024 accident did not contain diagnosis of a concussion or a traumatic brain injury in. (*Id.*) She also agreed that a CT scan done on August 9, 2024, showed "no acute intracranial abnormalities." (*Id.*). Dr. Weller testified that she included "this as a concussion, given that he was noted to have a positive head strike and that he had, quote, acutely altered mental status with preservation." ((Doc. 113) at 193.) Although Dr. Weller agreed that loss of consciousness can be a symptom or a sign of a concussion or a traumatic brain

injury, she refused to acknowledge that the video of the accident scene where Lopez-Ozuna was conscious and expressed remorse, was evidence that he did not exhibit a loss of consciousness in the immediate aftermath of the accident. (*Id.*) Additionally, she noted that "a complete loss consciousness or an extended loss of consciousness is not required" for a concussion to occur. (*Id.*)

Dr. Weller confirmed that she reviewed the investigative reports which recounted the events that led up to the car accident and thereafter. (*Id.* at 195.) Dr. Weller could not recall if the reports are consistent with the version of events that Lopez-Ozuna conveyed to Dr. Johnson because "she read those very early on." (*Id.*) Although Dr. Weller's report lists the investigative reports that she reviewed, she acknowledged that her report does not discuss the contents of those reports. ((Doc. 113) at 195–96.) Dr. Weller confirmed her agreement that what Lopez-Ozuna recalls is important for assisting counsel in his defense. (*Id.* at 196.)

Dr. Weller testified that she asked Lopez-Ozuna to tell her what he remembered about the events leading up to the accident. (*Id.*) She testified "that he had no memory for approximately one to one and a half hours prior to the accident." (*Id.*) Dr. Weller agreed that in the video Lopez-Ozuna was awake and "in obvious pain." (*Id.*) Dr. Weller could not confirm whether Lopez-Ozuna provided "consistent" and "cogent" responses to questions asked by law enforcement in the video. ((Doc. 113) at 196.) Dr. Weller testified that she would need to watch the video again, because she had not seen it prior to that day, and her recollection was that the questions were simple and straightforward. (*Id.* at 196–97.)

An August 9, 2024, report documenting Lopez-Ozuna's interactions with medical staff stated, "Patient is complaining of right arm pain, chest wall pain"; however, Dr. Weller testified that she was "not sure that [Lopez-Ozuna's] reporting that or if that is the presenting complaint as presented by the emergency responders." (*Id.* at 198–99.) Dr. Weller conceded that the patient, Lopez-Ozuna, most likely provided medical staff with the following information noted in the report: "patient amnesties to the event"; "patient

denies being on blood thinners"; and "patient denies drug use." (*Id.* at 199.)  Dr. Weller agreed that "[s]ometimes people don't want to admit when they committed crimes" and that it was "possible that Mr. Lopez just stated he didn't remember instead of reciting facts because he knew it can get him in trouble[.]"  (*Id.*)  Dr. Weller acknowledged that as a result, it was possible that Lopez-Ozuna could recall events but said that "he does not in order to help himself."  ((Doc. 113) at 200.)

Regarding transcripts of interviews of Lopez-Ozuna conducted by law enforcement on August 9, 2024, Dr. Weller agreed that Lopez-Ozuna provided law enforcement with "a fair amount of detail about what happened, including the color of his mother's car that he was driving[.]"  (*Id.* at 201.)  Dr. Weller acknowledged that she did not reference this interview in her report when she discussed memory collection; she simply talked about some of the tests and the resulting data.  (*Id.* at 201–02.)  She agreed that she is "biased" because she is a neuropsychologist who relies on the data.  (*Id.* at 202.)  When asked if information obtained during the interview was "just a different from of data," Dr. Weller testified that "[i]t's also a different kind of memory than the kind of memory that a neuropsychologist typically assesses."  (*Id.*)  Dr. Weller explained that "[t]his is more autobiographical memory, which is a completely different kind of memory from recall and recognition memory for new information."  ((Doc. 113) at 202.)  She further explained that autobiography memories are long-term memories which are "more resistant to change than short-term memory."  (*Id.*)  Dr. Weller testified that even the details that Lopez-Ozuna recounted to Dr. Johnson during his interview are long-term memories (e.g., "memory of a car," "a memory of who owns the car"), not newly formed working memories.  (*Id.* at 202–03.)  But she nevertheless agreed that "those memories are important in being able to properly assist counsel[.]"  (*Id.* at 203.)

With respect to her October 31, 2024, meeting with Lopez-Ozuna, Dr. Weller agreed that her report detailed that Lopez-Ozuna: (1) was oriented to place, date, and time; (2) rapport was easily established; (3) he was polite and engaged in the visit; (4) he cooperated with all tasks; and (5) he initially appeared fatigued, but "[a]s the visit

1    progressed, he showed increased latency of responses to questions." (*Id.* at 204–05; *see*
2    *also* Dr. Weller's Psych. Eval. 2/13/2025 at 3.) Dr. Weller testified that these behaviors
3    were true for all four (4) visits, with the exception of one (1) visit "where he was fatigued
4    very early on in the visit." ((Doc. 113) at 205; *see also* Dr. Weller's Psych. Eval. 2/13/2025
5    at 4–5.)

6         For the November 7, 2024, visit, Dr. Weller's report stated that Lopez-Ozuna "never
7    appeared to respond to internal stimuli." ((Doc. 113) at 205; *see also* Dr. Weller's Psych.
8    Eval. 2/13/2025 at 4.) Dr. Weller explained that this comment referred to symptoms of
9    psychosis; "responding to auditory hallucinations or visual hallucinations, something that's
10   not visible to the outside observer[.]" ((Doc. 113) at 205.) Dr. Weller testified that Lopez-
11   Ozuna did not exhibit signs of psychosis during any of the four visits. (*Id.*) Dr. Weller
12   agreed that her report also noted that during the November 7, 2024, visit, Lopez-Ozuna's
13   "thought processes were mostly coherent, logical, linear, and goal directed." (*Id.* at 205–
14   06; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 4.)

15        Dr. Weller further agreed that she used those same terms in her report when
16   describing the January 9, 2025, visit. ((Doc. 113) at 206; *see also* Dr. Weller's Psych. Eval.
17   2/13/2025 at4.) Specifically, she noted that Lopez-Ozuna "never appeared to respond to
18   internal stimuli"; his "thought processes were mostly coherent, logical, linear, and goal
19   directed"; "[h]e never spoke spontaneously"; "[h]is speech was of normal volume and
20   prosody"; and he was "cooperative and had adequate frustration tolerance, but limited
21   stamina." ((Doc. 113) at 206; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 4.) Similarly,
22   for the January 16, 2025, visit, Dr. Weller's report noted that Lopez-Ozuna's "emotional
23   presentation was stable and neutral"; he "never appeared to respond to internal stimuli";
24   and his "thought processes were mostly coherent, logical linear, and goal directed." ((Doc.
25   113) at 206; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 5.)

26        Dr. Weller refused to agree that "[t]hese are all signs of competence;" rather, she
27   testified, "Not necessarily. . . . I just don't know that they're directly linked to competency."
28   ((Doc. 113) at 206–07.) Dr. Weller agreed that one of the standards for competency relates

to a "defendant's ability to stay calm, [and] not be combative with his attorney"; and she acknowledged that Lopez-Ozuna was never combative with her.  (*Id. at* 207.)

Dr. Weller administered the Inventory of Legal Knowledge test to Lopez-Ozuna.  ((Doc. 113) at 207–08; Hr'g 3/4/2025 Govt.'s Ex. List (Doc. 104), Gov't. Ex 13; *see also* Dr. Weller's Psych. Eval. 2/13/2025.)   Out of the sixty-one (61) true/false questions, Lopez-Ozuna got fifty-eight (58) questions correct.  ((Doc. 113) at 208.)   Dr. Weller confirmed that Lopez-Ozuna incorrectly answered question 7, which says that "the defendant does not have to testify at trial[.]"   (*Id.* at 209.)   But she agreed that her report states that during the October 31, 2024, meeting, Lopez-Ozuna "knew that defendants do not have to testify on their own cases." (*Id.* at 209–10.)   She agreed that "this is an example of legal strategy[.]"  (*Id.* at 210.)   Dr. Weller acknowledged that she noted in her report that Lopez-Ozuna could not identify the specific amendment a person would be using if he chose not to testify.  (*Id.*)   However, she also acknowledged that his inability to do so was not concerning for competency purposes because "[a] lot of people . . . don't connect the amendment with that particular right."  ((Doc. 113) at 210.)

With respect to Lopez-Ozuna's "ability to understand the nature and the consequences of the proceedings again him[,]" Dr. Weller agreed that he "was able to recount to [her] the specific counts from his county indictment and his federal charges[.]" (*Id.* at 210–11; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 6.)   Dr. Weller acknowledged that when Lopez-Ozuna talked about the county charges, he "got all of those charges contained in the indictment exactly correct[.]"  ((Doc. 113) at 211.)   Dr. Weller agreed that Lopez-Ozuna's ability to assist in his defense is benefited by his understanding of the actual charges.  (*Id.*)

Dr. Weller acknowledged that she asked Lopez-Ozuna to describe what it means to be competent, even though it is a legal "term of art" and she testified that competency is "a sophisticated construct."  (*Id.* at 212; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 7.) Dr. Weller testified that she asks that question to everyone that she evaluates.  ((Doc. 113) at 212.)   Lopez-Ozuna told Dr. Weller that his lawyers were trying to find out if he was

competent "to help out with my case," but he did so in a question.  (*Id.* at 219; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 14.)  When Dr. Weller asked what he hoped the results of the competency finding would be, he said, "Good results.  Help my case."  ((Doc. 113) at 219; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 14.)  Dr. Weller agreed that she "did not follow up as to whether a competency finding or not competency finding in his mind would help him[.]"  ((Doc. 113) at 220.)  Dr. Weller reported that Lopez-Ozuna said that he believed that his attorneys "know[] what they are doing."  (*Id* at 212; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 7.)  Dr. Weller agreed that "building rapport with defense attorneys and having trust with defense attorneys" is necessary for assisting in one's defense.  ((Doc. 113) at 212.)

With respect to the section in Dr. Weller's report that addresses "appraisal of available defenses, on October 31, 2024 [she] asked Mr. Lopez-Ozuna what a plea bargain is."  (*Id.*)  Dr. Weller testified that Lopez-Ozuna responded, "to see how much time they'll give you," but "[h]e asked it as a question."  (*Id.*; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 8.)  Dr. Weller's report notes that "education was provided" after he asked this question.  ((Doc. 113) at 213; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 8.)  Regarding the type of education provided, Dr. Weller testified that "we talked in general about what a plea bargain is."  ((Doc. 113) at 213–14.)  Dr. Weller was not sure how she explained a plea bargain to Lopez-Ozuna, but testified that "[i]nstead of accepting his explanation of 'to see how much time they'll give you,' I provided education that a plea bargain was essentially a deal that was struck between defense and prosecution; that it did have to do with how much time a person might have to serve[;] [and] [i]t might be related to the charges."  ((Doc. 113) at 214.)  Dr. Weller was certain that she provided information "along those lines to him."  (*Id.*)

Dr. Weller testified that she is not sure whether the amount of prison time an individual would have to serve is the most important part of a plea bargain, but acknowledged that she does "think that it is an important part of understanding the concept of a plea bargain."  (*Id.* at 213.)  Dr. Weller agreed that knowing how much prison time

1    someone is potentially facing is important for assisting one's defense. (*Id.*)  Dr. Weller

2    also agreed that "a very important part of a plea bargain" is knowing "how much time

3    someone actually has to serve in prison for crimes that they're changed with." (*Id.*)  Dr.

4    Weller acknowledged that Lopez-Ozuna told her that he had been offered a plea agreement

5    in the state case, but not in the federal case.  ((Doc. 113) at 213.)

6         With respect to understanding of courtroom participants, Lopez-Ozuna said that

7    "the job of his defense attorney was to help you against your case[.]" (*Id.* at 214–15; *see*

8    *also* Dr. Weller's Psych. Eval. 2/13/2025 at 9.)  Dr. Weller agreed that this "is an answer

9    that's important to assist in his defense, to know that his defense attorneys are working for

10   him[.]"  ((Doc. 113) at 215.)  When Dr. Weller asked for examples of how a defense

11   attorney helps a client, Lopez-Ozuna responded, "Not sure." (*Id.*; *see also* Dr. Weller's

12   Psych. Eval. 2/13/2025 at 9.)  Dr. Weller again noted that "education was provided."

13   ((Doc. 113) at 215; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 9.)  Dr. Weller testified

14   that they "[p]robably talked about what a defense attorney typically does in the courtroom,

15   including supporting the defendant's side, providing evidence in support of the allegations,

16   trying to get the best possible outcome for him."  ((Doc. 113) at 215.)  Dr. Weller confirmed

17   that later in the interview on October 31, 2024, when Lopez-Ozuna was again asked about

18   the role of his defense attorney, he responded, "To help you[,]" and he responded the same

19   way during the January 16, 2025, interview. (*Id.*; *see also* Dr. Weller's Psych. Eval.

20   2/13/2025 at 9.)  Dr. Weller agreed that "that's a correct answer", but added "[i]t's just

21   relatively simplistic."  ((Doc. 113) at 215–16.)

22        In the section of Dr. Weller's report that discusses "planning of legal strategy," Dr.

23   Weller noted that she asked Lopez-Ozuna "if he would be willing to testify on his own

24   defense." (*Id.* at 216; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 12.)  Lopez-Ozuna

25   responded, "Probably no[.]"   ((Doc. 113) at 216; *see also* Dr. Weller's Psych. Eval.

26   2/13/2025 at 12.)  Dr. Weller agreed that when she followed up on that response, Lopez-

27   Ozuna said "he felt a little bit worried"; and then when asked why he was worried, he said,

28   "If I say something wrong."  ((Doc. 113) at 216; *see also* Dr. Weller's Psych. Eval.

2/13/2025 at 12.)  Dr. Weller confirmed that Lopez-Ozuna "stated that he would go along with his defense attorneys if they decided not to have him testify at trial[.]"  ((Doc. 113) at 216; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 12.)  She also confirmed that her report notes that when Lopez-Ozuna could not provide any advantages or disadvantages of testifying, and she again provided education.  ((Doc. 113) at 216; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 12.)  As to the education provided, Dr. Weller testified: "I think we just talked in general about how testifying may be able to help people in some situations and how not testifying may be helpful to some people in other situations."  ((Doc. 113) at 217.)

Lopez-Ozuna also "denied that he would ever want to represent himself in court." (*Id*.; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 12.)  Dr. Weller agreed that was "a trial strategy as well[.]"  ((Doc. 113) at 217.)  Dr. Weller confirmed that she did not have any concern about Lopez-Ozuna acting out or misbehaving in court.  (*Id.* at 219; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 13.)

Dr. Weller agreed that part of assisting counsel is the ability "to engage in strategy with your defense counsel and not simply just acquiesce or rollover to whatever the defense attorney might say if someone believed that was not the correct course."  ((Doc. 113) at 218.)  When pressed regarding whether Lopez-Ozuna's willingness to tell his attorneys when he believes a witness is lying is evidence of an ability to assist counsel, Dr. Weller testified, "I suppose, yes. You could look at it that way." (*Id*. at 218–19.)  She agreed that the ability to do so is "an important part of assisting in one's defense[.]" (*Id*. at 219.)

Dr. Weller acknowledged that Lopez-Ozuna recalled a fair amount of detail about an injury that he sustained when was approximately six or eight years old.  (*Id.* at 220; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 15.)  She also agreed that Lopez-Ozuna had retained this long-term memory regardless of whether he recalls the injury or if it was conveyed to him by a family member.  ((Doc. 113) at 220–21.)

Dr. Weller also acknowledged that the medical records from the 2023 accident reflect that Lopez-Ozuna denied that he lost consciousness.  (*Id.* at 221.)  Dr. Weller

thought that the medical records suggested or supported that "he may have had a brief loss of consciousness." (*Id.*) She admitted that she is unsure why she wrote in her report that it was "unclear" about a loss of consciousness. (*Id.* at 222.) Dr. Weller agreed that if the medical records noted that Lopez-Ozuna had lost consciousness, she would have specifically stated that in her report. (*Id.*) In fact, Dr. Weller testified that "[i]f it had been — definitely if it had been described in that way, I might have even quoted it." (*Id.*) Dr. Weller admitted that she did not do that in this instance. ((Doc. 113) at 222.) She agreed that the medical records state that no head CT scans or MRIs were required. (*Id.*)

When asked to confirm that she disagreed with "Dr Johnson when he called competency a low bar," Dr. Weller testified: "I'd like to think that it doesn't have a low bar." (*Id.*) She also confirmed that "her bias is as a neuropsychologist, and [she's] more driven by data[.]" (*Id.* at 223.) Dr. Weller agreed that Lopez-Ozuna's competency evaluation involved a lot of standardized tests. (*Id.*) She disagreed that her view is that neurophysiological testing is always necessary to make a competency determination. ((Doc. 113) at 223–24.) Dr. Weller explained that testing is her preference because she "find[s] it an incredibly helpful component of a competency evaluation." (*Id.* at 224.)

### 3. Re-Direct Examination

With regard to whether Lopez-Ozuna's inability to assist counsel was dependent on having had two concussions, Dr. Weller testified that "[t]he concussions are relevant to me as a neuropsychologist[,] [b]ut if he had never had them, he would still have the preexisting conditions of borderline intellectual functioning and [ADHD] that would play a role in his competency." (Hr'g Tr. 3/4/2025 (Doc. 113) at 225–26.) Dr. Weller further testified that her competency determination was "based on what is measured by testing," so "it wouldn't really matter if he had concussions or not[.]" (*Id.* at 226.)

Dr. Weller explained that there is a difference between "autobiographical memory" and "recalling new information that you receive[;] she added that "[m]emory is not one thing[,]" there are different kinds and different stages of memory. (*Id.* at 227.) She further explained that "it is much less likely for a person to forget long-term, meaning older

autobiographical or episodic memories, than it is for somebody to have memory problems with relatively newer information." (*Id.*) Dr. Weller's view is that a person is not "automatically competent" simply because they present as "coherent, logical, linear, and goal directed[.]" (*Id.*) She believes that a person does not "have to be incompetent in every conceivable way in order to not be competent under *Dusky*[.]" ((Doc. 113) at 227.)

Dr. Weller again made clear that the Inventory of Legal Knowledge Test is not "determinative by itself of competency;" it "measures feigning of legal knowledge." (*Id.* at 228.) Dr. Weller noted that "the purpose of the test is to figure out if somebody is deliberately misrepresenting their legal knowledge." (*Id.*) Dr. Weller described the test as "a performance validity indicator." (*Id.*) Dr. Weller reiterated that a person "can understand a lot about courtroom proceedings and what people do in their roles and have deficits in other areas that could make them incompetent[.]" (*Id.*) The testing done on October 31, 2024, and November 7, 2024, "raised red flags" that caused Dr. Weller "to later do a full-blown neuropsychological evaluation[.]" (*Id.* at 228–29.)

### 4. The Court's Examination

The Court asked Dr. Weller if ADHD medication could "help with memory issues, retention of information, or any cognitive issues" that may be attributed to ADHD. (Hr'g Tr. 3/4/2025 (Doc. 113) at 230.) Dr. Weller testified as follows:

> Medications are for treatment only. There is no cure of ADHD because it's hardwired into the brain. But medications for ADHD can indirectly help with some kinds of memory because attention is the gatekeeper for memory. So if you improve attention, you increase the chances that person will be focused at the time of hearing information and, therefore, possibly more likely to recall it later.

(*Id.*)

Dr. Weller confirmed the meetings with Lopez-Ozuna took place at CoreCivic. (*Id.* at 231; *see also* Dr. Weller's Psych. Eval. 2/13/2025 at 1.) Lopez-Ozuna did not tell her whether he had been woken up very early for those meetings, as is the case when he is transported to court. ((Doc. 113) at 231.) The Court asked Dr. Weller to explain the

"interplay" between fatigue and "putting forth good effort on tests;" specifically, how someone can be tired and/or fatigued but nevertheless, in her opinion, put in good effort on tests. (*Id.*) She testified that "[t]he tests of effort and motivation are objectively scored[,] [s]o if a person scores above a certain amount or gets a certain number of points of scores below a particular cutoff, they are viewed as putting forth good effort." (*Id.*) Dr. Weller further noted that "[a] person can be tired or they can be depressed or they can be anxious and still try hard for the examiner." (*Id.*)

The Court followed up by asking whether Lopez-Ozuna's "fatigue or being tired account for some of the poor scores" on certain tests and/or if there is "any way to verify that the fatigue or tiredness didn't cause those below average scores[.]" (*Id.* at 231–32.) Dr. Weller testified that she had "no way of determining what percentage or what amount of variability in his test scores was accounted for by his fatigue." ((Doc. 113) at 232.) She also testified that it was also possible that Lopez-Ozuna's "physical injuries and the pain he was in" at the time of the interviews and testing "contributed to his inability to focus[,] but, she could not say "to what degree" the injuries and/or pain were contributing factors. (*Id.*)

The Court prefaced its next question by noting that Dr. Weller has testified that Lopez-Ozuna has a "rudimentary" or "superficial" understanding of the criminal process and the players, "but he couldn't explain the why to certain questions" or why rights are important. (*Id.* at 233.) The Court asked Dr. Weller: "[W]hy can't the lawyers explain the why? Why is he the one that has to explain the why?" (*Id.*) Dr. Weller responded, "Well, he's only explaining the why to me during our evaluation because I'm asking for it." (*Id.*) Dr. Weller continued:

> Based on my conversation with defense counsel, what they reported to me is that they have tried to explain these concepts to Mr. Lopez-Ozuna. In fact, they have tried explaining them multiple times across meetings with him, but the information is not being retained. His attention and/or memory are insufficient to allow him to retain that important information, despite hearing it from them across time.

((Doc. 113) at 233.)

The Court explained to Dr. Weller that there are many defendants in federal court who are from another country, have a sixth-grade education (or less), and have no experience with or knowledge of the U.S. criminal justice system. (*Id.* at 234.) The Court noted that it suspects that the lawyers for these defendants would likely describe their client's understanding of the legal system "as rudimentary or superficial." (*Id.*) The Court also suspects that the lawyers do not "do a lot of probing" and questioning their clients about why a certain right is important. (*Id.*) The Court asked Dr. Weller to explain the difference between these defendants and Lopez-Ozuna. (*Id.*) Dr. Weller responded as follows:

> Mr. Lopez-Ozuna was born in this country. He did go through American education. He did, in fact, complete some high school. So he got that far in school. Granted, he may have progressed because his needs were neglected by the school system, and they just wanted to graduate him. But he's obviously had the opportunity to learn more legal information than somebody who didn't have the opportunities that he had.

((Doc. 113) at 234.) Dr. Weller added that Lopez-Ozuna "was born with neurodevelopmental conditions[,] . . . [which] persist across the lifespan" which Dr. Weller characterized as "preexisting risk factors for cognitive difficulties." (*Id.* at 235.)

In response to the Court's question of how Dr. Weller knows that Lopez-Ozuna was born with intellectual deficiencies, she testified they are "identified as neurodevelopmental disorders" and the definition of those disorders are that they are "hardwired, present at the time of birth, persist across the lifespan, and are typically not amenable to treatment." (*Id.*) Because Dr. Weller's answer was (unintentionally) not responsive to the Court's (perhaps inarticulate) question, the Court confirmed with Dr. Weller that her testing led her to conclude that Lopez-Ozuna was born with intellectual deficiencies. (*Id.*)

The Court's final area of questioning pertained to the Inventory of Legal Knowledge Test. (*Id.* at 236.) The Court first noted that it appears that Lopez-Ozuna "kind of killed it" on the test, meaning "he did really well." ((Doc. 113) at 236.) Dr. Weller believes that

she administered this test prior to providing any legal education to Lopez-Ozuna. (*Id.*) Dr. Weller's primary concern with Lopez-Ozuna is his inability to assist his lawyers, but she also believes that "he has some deficits in his legal knowledge." (*Id.* at 236–37.) The Court pointed out that the defendant correctly answered "true" to the question that "[t]alks between the defendant and his lawyers are supposed to be in private." (*Id.* at 237.) The Court asked Dr. Weller whether knowing this important aspect of the legal system demonstrates, at least to some extent, that Lopez-Ozuna can assist his attorneys. (*Id.*) Dr. Weller responded, "I don't disagree with you[,] [b]ut what I did see was some inconsistency in his responses to the specific items on the Inventory of Legal Knowledge and his answers to my questions during the interview." ((Doc. 113) at 237.)

Dr. Weller reiterated that the Inventory of Legal Knowledge Test is not a test of legal knowledge even though it looks that way. (*Id.* at 240.) She testified that "[i]t gives the impression that it is, but that's not the purpose of the test." (*Id.*) She again explained that "[t]he purpose of the test is to determine if someone is deliberately faking their legal knowledge, making themselves look like they do not know enough about the legal system." (*Id.*) The conclusion from research data is that if a person scores 47 or lower, they are "suspected of faking that [they] don't know information about the legal system." (*Id.*)

### 5.  Follow-Up Examination by Defense Counsel

Lopez-Ozuna's many correct answers on the Inventory of Legal Knowledge Test does not demonstrate that Lopez-Ozuna "could apply those concepts to himself, his case, his interactions with his attorneys, and his decisions[.]" ((Doc. 113) at 238.) The tests involving abstract reasoning and cognitive functioning, which Lopez-Ozuna performed poorly on, were "particularly helpful in that regard." (*Id.*)

## III.  DISCUSSION

### A.  Legal Standards

"A defendant is incompetent to stand trial if the court finds 'by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature

and consequences of the proceedings against him or to assist properly in his defense[.]'" *United States v. Frank*, 956 F.2d 872, 874 (9th Cir. 1991) (quoting 18 U.S.C. § 4241(d)). Competency requires "the mental acuity to see, hear and digest the evidence, and the ability to communicate with counsel in helping prepare an effective defense*." Odle v. Woodford*, 238 F.3d 1084, 1089 (9th Cir. 2001). In *Dusky v. United States*, the Supreme Court held that:

> [I]t is not enough for the district judge to find that 'the defendant (is) oriented to time and place and (has) some recollection of events,' but that the 'test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as factual understanding of the proceedings against him.'

362 U.S. 402, 402–03 (citations omitted).

The government bears the burden of demonstrating that the defendant is competent to stand trial. *Frank*, 956 F.2d at 875; *United States v. Hoskie*, 950 F.2d 1388, 1392 (9th Cir. 1991). A court's determination of competency is a factual, rather than a legal determination. *United States v. Hoskie*, 950 F.2d 1388, 1392 (citing *United States v. Frank*, 933 F.2d 1491, 1493 (9th Cir. 1991); then citing *United States v. Lindley*, 774 F.2d 993, 993 & n.1 (9th Cir. 1985)). In determining competency, a court "may rely on a number of factors, including medical opinion and the court's observation of the defendant's comportment." *United States v. Nichols*, 56 F.3d 403, 411 (2d Cir. 1995) (citations omitted); *see also United States v. Garza*, 751 F.3d 1130, 1134 (9th Cir. 2014) (finding three (3) broad categories of evidence relevant to competency: "medical history, the defendant's behavior in and out of court, and defense counsel's statements about the defendant's competency."). "In performing its fact-finding and credibility functions [to determine competency], a district court is free to assign greater weight to the findings of experts produced by the Government than to the opposing opinions of the medical witnesses produced by the defendant." *Frank*, 956 F.2d at 875 (citing *Lindley*, 774 F.2d at 993).

The Supreme Court has noted that requiring a criminal defendant to "be competent has a modest aim:  It seeks to ensure that he has the capacity to understand the proceedings and to assist counsel."    *Godinez v. Moran*, 509 U.S. 389, 402 (1993).    Although "psychiatrics and scholars may find it useful to classify various kinds and degrees of competence . . . the Due Process Clause does not impose these additional requirements." *Id*.    Moreover, an attorney's doubts about a defendant's mental capacity "does not inexorably lead to the conclusion that [a defendant] [is] incompetent to stand trial." *Hoffman v. Arave*, 455 F.3d 926, 938 (9th Cir. 2006).

The Ninth Circuit has recognized that "[t]he standard for competence to stand trial requires nothing more than that a defendant have some minimal understanding of the proceedings against him."    *United States v. Hernandez*, 203 F.3d 614, 620 n.8 (9th Cir. 2000) (citing *Godinez*, 509 U.S. at 396).  Indeed, "[t]hose with mental disorders 'frequently know the difference between right and wrong and are competent to stand trial,' even if they are regarded as less culpable because of their mental capacity."    *Hoffman*, 455 F.3d at 938 (quoting *Atkins v. Virginia*, 536 U.S. 304, 318 (2002)).    Furthermore, "competency to stand trial requires an understanding of the *factual* basis of the proceedings, and does not require mastery of technical legal knowledge."    *Id*. (emphasis in original) (*citing Godinez*, 509 U.S. at 402; then citing *Allard v. Helgemoe*, 572 F.2d 1, 4 (1st Cir. 1978) (concluding that a defendant's inability to understand the intent element of a crime did not render him incompetent)).

## B.    Analysis

Both doctors testified that there is not a test that can determine whether a person is competent to stand trial.  As a result, the Court must assess which mental health professional to side with.  The Court recognizes that both Dr. Johnson and Dr. Weller are both knowledgeable and experienced mental health professionals who have conducted hundreds of competency evaluations.

In reaching their opposite conclusions regarding Lopez-Ozuna's competency, the doctors applied the same legal test – *i.e.*, the *Dusky* standard.  Their methods, however,

were very different.  Dr. Weller is a neuropsychologist and relied heavily on neurological testing to conclude that Lopez-Ozuna is not competent.  (*See, e.g.,* Hr'g Tr. 3/4/2025 (Doc. 113) at 136, 147–50; *see also* Dr. Weller's Psych. Eval. 2/13/2025.)  Dr. Weller conceded that she is biased in that regard because she believes the data she receives about a person's cognitive functions is more important than their ability to interact with her during an interview.  ((Doc. 113) at 202, 223.)  By contrast, Dr. Johnson relied almost exclusively on his forensic interview of Lopez-Ozuna; specifically, how he presented during the interview, their discussions, and his reasonably rational and logical thought process.  (*See* (Doc. 113) at 11–13; *see also* (Doc. 78).)  Notwithstanding the different techniques used, both doctors found Lopez-Ozuna to have below average cognitive abilities.  Moreover, Dr. Johnson agreed with Dr. Weller's diagnoses of Lopez-Ozuna's psychological conditions (*e.g.* borderline intellectual functioning and ADHD) that contribute to his low cognitive functioning.  Where they differ is the impact of his low cognitive functions on his competency to stand trial.

The doctors ascribe to very different views of what is required for a finding of competency to stand trial.  Dr. Johnson defines competency to stand trial as a low bar.  Specifically, Dr. Johnson believes that "the concept of competency to stand trial is a basic understanding" of legal concepts.  (Hr'g Tr. 3/4/2025 (Doc. 113) at 29–30.)  He does not believe that competency requires an understanding of legal concepts to an advanced level, which is what Dr. Weller was trying to assess when she questioned Lopez-Ozuna "to a more sophisticated level" about legal concepts.  (*Id.* at 29.)  Moreover, Dr. Johnson considers "competency [to be] a legal determination, not a psychiatric diagnosis."  (*Id.* at 80.)

Dr. Weller countered that if she took competency to a "sophisticated" or "advanced" level as Dr. Johnson's claims, she did so because she believes that competency is a "fairly sophisticated construct."  (*Id.* at 145.)  Dr. Weller testified that she is not going to conclude that a person is competent simply because they can "parrot" back a legal term or concept;

she needs to know that the person understands the term or concept. (*Id*. at 180).[5]  Based on Lopez-Ozuna's low test scores, Dr. Weller expects that: he would not "understand a lot of what is being communicated" to him by his attorneys; he would have difficulty formulating verbal responses to counsel or would be slow in doing so; he will have greater difficulty in a stressful situation; he will have trouble sustaining attention during meetings and remembering what was discussed; and reading discovery unsupervised would be a significant challenge. (*Id*. at 158–59, 175.) She also believes the testing shows that Lopez-Ozuna lacks the abstract abilities to pick up on legal nuances.[6]

Based on the case law discussed above, the Court finds that Dr. Johnson's view that competency to stand trial is a "low bar" is consistent with the *Dusky* standard.  Dr. Weller's view that competency is a "fairly sophisticated construct" and requires abstract abilities to pick up on legal nuances is at odds with Supreme Court and the Ninth Circuit precedent. These cases hold that a defendant need only have some minimal understanding of the proceedings against him and not a mastery of technical legal knowledge to assist counsel. *See Atkins v. Virgina*, 536 U.S. 304, 318 (2002) (Supreme Court noted that "[m]entally retarded persons frequently know the difference between right and wrong and are competent to stand trial."); *see also United States v. Telles*, 18 F.4th 290, 300 (9th Cir. 2021) (*quoting United States v. Garza*, 751 F.3d 1130, 1136 (9th Cir. 2014) ("Even a mentally deranged defendant is out of luck if there is no indication that he failed to understand or assist in his criminal proceeding.")

       1.  <u>Rational and factual understanding of the proceedings, constitutional rights, legal concepts, and the key players in the courtroom.</u>

---

[5] It is worth noting that Lopez-Ozuna's rather simplistic choice of words and descriptions of legal concepts – *e.g.* he has the right to "stay quiet," his lawyer's job is to "help with his case," a prosecutor's job is to make him "look bad" – undercut the notion that he was "parroting" information provided by his attorneys or either doctor.

[6] Dr. Weller initially testified that the concussions sustained by Lopez-Ozuna from car accidents in 2023 and 2024 played a role in her conclusion that he was not competent.  However, after being confronted with the medical records that do not mention a concussion in either instance, she testified that her competency determination is "based on what is measured by testing, so "it wouldn't really matter if he had concussions or not[.]"  (Hr'g Tr. 3/4/2025 (Doc. 113) at 226.)

Dr. Johnson opined that Lopez-Ozuna demonstrated a fundamental, rational, and factual understanding of the court proceedings and the role of the key individuals involved in the proceedings.  (Hr'g Tr. 3/4/2025 (Doc. 113) at 34.)  Conversely, Dr. Weller opined that Lopez-Ozuna has a "rudimentary or superficial understanding of some of the legal concepts and the roles of the people in the courtroom setting" (*Id*. at 179–80.)  During her evaluation, when Lopez-Ozuna answered a question about a constitutional right or legal concept, Dr. Weller asked a follow-up question about "why" the right or concept exists or is important.  The Court's view is that "why" questions involve legal knowledge and/or nuances that most laypeople would not be able to answer.  In fact, Dr. Weller agreed with the Court that the "why" questions should be answered by the attorneys if put to them by the client, not vice versa.  Thus, Dr. Weller's view of competency requires a mastery of technical legal knowledge that the Due Process Clause does not.

### a.    Understanding of the Proceedings against him.

#### i) *Charges and the facts that led to the charges*

Lopez-Ozuna told Dr. Johnson why he had been arrested, the charges against him, and his version of the events that led to his arrest.  He explained that he had been arrested for transportation of illegal aliens.  (Hr'g Tr. 3/4/2025 (Doc. 113) at 16.)  All of the charges had to do with people being put at risk for harm and one charge also had to do with one person dying.  (*Id*.)  Lopez-Ozuna said there were state charges as well "regarding something about conspiracy and theft."  (*Id*. at 18.)

Lopez-Ozuna told Dr. Johnson a logical and coherent story about the events that led to his arrest.  Although Dr. Johnson asked some clarifying questions, Lopez-Ozuna "was able to give his version fairly reasonably," and generally in a narrative form.  (*Id*. at 15, 19–20.)  He said that the alien smuggling resulting in a death had to do with the car he was driving and that "he was involved situation in which he didn't pull over."  (*Id*. at 18.)  He provided a detailed description of how he became involved in the alien smuggling event and his actions and interactions up until the point of the accident.  (Hr'g Tr. 3/4/2025 (Doc. 113) at 18.)  Specifically, he told Dr. Johnson the following: he was contacted through a

WhatsApp text message that had been set up by his friend; his friend had contacted whoever he set up to do this with; he needed money and was offered $7,000 to transport people; he was supposed to meet seven people in or near Arivaca; his friend was riding with him; they were driving his mother's Chevy Tahoe; he recalls being on a dirt road and then a regular road; he met the people in the desert near the side of a mountain; there were men and women in the group and they were likely in their twenties; he did not know these people; he looked in the back of his car and saw lots of people; his friend was supposed to drive three of the people in another car, but all seven people ended up in his car; and he was supposed to take them to Phoenix, but did not yet know where in Phoenix.[7]  (*Id.* at 18–19.)  Lopez-Ozuna told Dr. Johnson that he does not recall the accident; the next thing he remembers is waking up in the hospital.  (*Id.* at 19.)  He learned from his mother that the "cops were chasing him." He said he also learned that five people had been badly hurt and a woman had been killed.[8]  (*Id.*)

Lopez-Ozuna also recounted his federal charges to Dr. Weller.  He knew that the charges are felonies, which are more serious than misdemeanors.  He also knew that his felony charges are even more serious because a person died.  With respect to the state charges, Dr. Weller testified that when Lopez-Ozuna talked about the state charges, he "got all of those charges contained in the indictment exactly correct[.]"  (Hr'g Tr. 3/4/2025 (Doc. 113) at 211.)

Lopez-Ozuna's ability to recount the charges to both doctors and the coherent and logical story he told to Dr. Johnson about the events that led to the charges not only show that he understands the proceedings against him, but his memory on this subject area is intact.  These are not long-term autobiographical memories (which a person is not likely to forget) that Dr. Weller distinguished from Lopez-Ozuna's ability to retain and recall newer information, such as legal concepts explained to him for the first time by his attorneys.

---

[7] Dr. Johnson testified that the investigative reports are consistent with the story told by Lopez-Ozuna.  (28)

[8]  Like the doctors, the video showing Lopez-Ozuna conscious and responding to agent's questions has no bearing on the Court's competency determination.

However, as discussed below, Lopez-Ozuna also demonstrated the ability to retain and recall new legal concepts. Finally, Lopez-Ozuna's ability to provide Dr. Weller with a verbatim account of the state charges and his detailed description of the events that led to his arrest to Dr. Johnson — when compared to his statement to Dr. Weller that he cannot recall anything that happened 1.5 hours before the accident — raises a concern that he may be feigning or exaggerating his memory issues, especially to Dr. Weller.

### ii) *Possible sentence if found guilty*

Lopez-Ozuna told Dr. Johnson that if he is found guilty he could spend the rest of his life in prison, which makes him anxious. He told Dr. Weller that he did not yet know what possible sentence he could receive. That comment makes sense given that he has not been offered a plea agreement in the federal case. Thus, at this point, all he knows about a possible sentence is what he told Dr. Johnson – it could be up to life in prison.[9]

When asked by Dr. Weller to explain probation, Lopez-Ozuna said: "It means they did a crime, and they just got out of jail." (Dr. Weller's Psych. Eval. 2/13/2025 at 9.) Lopez-Ozuna also told Dr. Weller: "you could be out, but you'll still be watched by a probation officer." (*Id.*) He listed the following possible conditions of probation: curfew, house arrest, check in; no smoking, drinking or drugs; don't get arrested; maybe can't drive; and have a job. (*Id.*)

The Court finds it odd that Dr. Weller asked Lopez-Ozuna about probation given that there is little chance he would get probation even if he pleaded guilty with a plea agreement. But the discussion about probation applies equally to a term of supervised release imposed following a prison sentence. Based on the discussion about probation, Lopez-Ozuna already understands much of what would be required of him if placed on supervised release.

### b. Understanding of Rights

### i) *Right to remain silent*

---

[9] He also knows he would serve his sentence in a prison if he was found guilty; whereas a person found guilty but insane would be put in a mental hospital.

Lopez-Ozuna told Dr. Johnson that he had the right to "stay quiet," and then described the right to remain silent.  ((Doc. 78) at 4.)  He described the right to remain silent to Dr. Weller as: "You have the right not to tell them [the cops] nothing."  (Dr. Weller's Psych. Eval. 2/13/2025 at 7.)

He told Dr. Weller that a person has the right to remain silent and that anything you say can be used against you.  When asked what it means that anything can be used against you in court, he said:  "Means anything you say before they arrest you, they can use it against you." (*Id.* at 9.)  When asked what he meant by that, he said:  "They can use it as evidence." (*Id.*)  He also told Dr. Weller that a person has a right not to speak to anyone before a person gets a lawyer. (*Id.* at 6.)  When asked why this right was important, he said: "Because anything you tell them can mess up your case."  When asked what he meant by that statement, he said, "If you tell them something you were not supposed to, they can use it against you." (*Id.*)  When asked again why it was important to know that what a person says can be used against them in court he said: "Cuz it could go against you."  (Dr. Weller's Psych. Eval. 2/13/2025 at 6.)

The Court finds that Lopez-Ozuna's comments accurately describe the right to remain silent and that he understands that right.  In fact, Lopez-Ozuna was able to answer Dr. Weller's question of "why" the right to remain silent is important.

*ii)    Right to counsel*

With respect to the right to counsel, Lopez-Ozuna told Dr. Weller that "if you can't afford an attorney, one will be given to you."  (Dr. Weller's Psych. Eval. 2/13/2025 at 6–7.)  Dr. Weller noted that Lopez-Ozuna could not explain why it was important for everyone to be provided with an attorney if they cannot afford one. (*Id.*)  When asked by Dr. Weller to explain what the right to have an attorney means, he said, "Just that you need a lawyer." (*Id.* at 7.)  When asked why, he said: "So they can help you." (*Id.*)  When asked how a lawyer could help, he said, "Help you get out" of jail. (*Id.*)  When reminded by Dr. Johnson about the right to have an attorney, Lopez-Ozuna cut him off and said he knew that right but had forgotten it.  ((Doc. 78) at 4.)

Lopez-Ozuna clearly understands his right to counsel.  The fact that he could not explain why it was important for indigent defendants to be appointed counsel is of no consequence.  Competency only requires that a defendant understand a constitutional right, and not the legal underpinnings behind a right.

### iii)  Defendant's right not to testify

Lopez-Ozuna told Dr. Weller that he knew that he was the defendant, but he did not know the definition of a defendant.  He told Dr. Weller that he knew that a defendant does not have to testify, but he could not provide advantages or disadvantages of testifying at trial.  (*See* Dr. Weller's Psych. Eval. 2/13/2025 at 10.)  When asked what amendment he would be using, he said: "To remain silent?"  (*Id*.)  Dr. Weller noted that Lopez-Ozuna "guessed" that his lawyers would ask him questions first but was not sure; but he knew the prosecutors could then question him.  (*Id*.)  When asked why the prosecutors would question him, he said, "To get evidence against you." (*Id*.)  Lopez-Ozuna believed that he would have to tell "everything" that happened if he testified.  (*Id*.)  He said he probably would not testify because he was "a little bit worried" that he might "say something wrong." (Dr. Weller's Psych. Eval. 2/13/2025 at 12.)

The discussion above shows that Lopez-Ozuna has an understanding of a defendant's right not testify at trial, which he identified from his right to remain silent.  Although Dr. Weller said he could not provide examples and disadvantages of testifying, he actually did identify disadvantages of testifying: the prosecutor would question him to get evidence against him; he was concerned that "he may say something wrong;" and he would have to testify about "everything."  His attorneys will advise him about other possible disadvantages as well as any advantages based on the government's case against him.  His identification of the disadvantages of testifying likely means that he will also be able to understand the advantages of testifying, as well as other disadvantages identified by his attorneys.

### iv)  Right to a Fair trial

Dr. Weller did not specifically ask Lopez-Ozuna about the right to a fair trial or explain that right to him.  Lopez-Ozuna did not bring up the right to a fair trial to Dr. Johnson.  When Dr. Johnson mentioned the right to a fair trial, Lopez-Ozuna said he was not aware of that right.  ((Doc. 78) at 4.)  Dr. Johnson explained that the right to a fair trial meant that he would be treated fairly by the court and that the trial would be handled in a fair manner to be able to have a fair outcome.  (*Id.*)  Dr. Johnson testified that Lopez-Ozuna understood the right to a fair trial without difficulty after being educated.  (Hr'g Tr. 3/4/2025 (Doc. 113) at 22–23.)[10]

When asked by Dr. Johnson if he thought he could receive a fair trial, Lopez-Ozuna said that he was unsure; he said he wondered if a trial would be fair.  (*Id.* at 23; *see also* (Doc. 78) at 4.)  When asked why he felt that way, he said because of the complexity of things and the serious charges against him.  ((Doc. 113) at 23.)  He added that it was a case that might make people jump to conclusions.  (*Id.*)  Dr. Johnson made clear that Lopez-Ozuna's uncertainty about whether he could have a fair trial was not the result of mental health issues or his not understanding that right.  (*Id.*)  Rather, Lopez-Ozuna's concerns about a fair trial stem solely from his fear that it may have a bad outcome because of the nature of the charges; those concerns also show that he understands the seriousness of his case.[11]  (*Id.*)

### c.    Understanding of legal concepts

#### i)  Competency

When asked by Dr. Weller during their interview what it meant to be competent to stand trial, he said, "To make sure I understand everything."  (Dr. Weller's Psych. Eval. 2/13/2025 at 7.)  He later told Dr. Weller that he did not know what the term "competency to stand trial" meant.  (*Id.* at 13.)  When asked if he thought he was competent, he said,

---

[10] The Court notes that the "right to a fair trial" is an ambiguous or amorphous concept in a vacuum; however, it is encompassed by many of the other rights that Lopez-Ozuna demonstrated that he understood.

[11] The Court suspects that defendants routinely express to their attorneys that they are concerned about getting a fair trial and/or that they got a fair trial.

"Not really." (*Id*.)  When asked why, he said:  "Just by not understanding certain things."  (*Id*.)  When again asked what it meant if a person is not competent after receiving education, he said, "They don't know what's going on."  (*Id*.)  Lopez-Ozuna did not know what would happen if a person were found incompetent.  (Dr. Weller's Psych. Eval. 2/13/2025 at 13–14.)  When asked why his a lawyers are trying to find out if he is competent, he said, "To help out with my case."  (*Id*. at 14.)  When asked what he hopes the results of the evaluation will be, he said, "Good results, help my case."  (*Id*.)

As the government pointed out, it was odd for Dr. Weller to ask Lopez-Ozuna what competence means given that she believes it is a "sophisticated construct."  Nevertheless, the Court believes that Lopez-Ozuna demonstrated a sufficient understanding of competence to stand trial.  Although he used simplistic terms, he was correct that a person who is competent to stand trial must "understand everything" and "know what's going on."  Indeed, that is the precise focus of the instant inquiry.

### ii)  Possible pleas and plea bargain

Lopez-Ozuna told Dr. Weller that a person can plead guilty or not guilty.  (Dr. Weller's Psych. Eval. 2/13/2025 at 8.)  He said that "guilty" means "you are taking responsibility for the crime[,]" and "not guilty" means "trying to prove that you're innocent."  (*Id*.)  When asked about the chance that he would be found guilty, he said he did not know.  (*Id*. at 11.)

Lopez-Ozuna described a plea bargain to Dr. Weller as:  "To see how much time they will give you[.]"  (*Id*. at 8.)  When asked the advantages of a plea bargain or pleading guilty, he said, "Lower sentence?  I'm not sure."  (*Id*.)  As to the disadvantages, he said:  "Still have to do the all that time" and "admitting you did the crime.  (Dr. Weller's Psych. Eval. 2/13/2025 at 8.)  He told Dr. Weller that he knew what a plea bargain is but could not provide an explanation.  (*Id*.)  He was not sure of what right he would give up if he takes a plea bargain.  (*Id*.)

Lopez-Ozuna told Dr. Johnson that a plea agreement involves admitting guilt to a lower charge or a lower number of charges to receive less time in prison.  ((Doc. 78) at 4.)

He also told Dr. Johnson that he has been offered a plea agreement in the state case and said that he knew that if he pleaded guilty he would not have a trial.  (*Id.*)  When asked if he knew if he would go to trial or plead guilty, he said he would not go to trial.  (*Id.*)

The Court finds that Lopez-Ozuna demonstrated a sufficient understanding of a guilty plea, a not guilty plea, and a plea bargain.  Specifically, he knows that if you plead guilty you do not have a trial because you admit that you committed the crime; and he knows that a plea bargain can result in less prison time.  Moreover, he engaged in a rational thought process by identifying a legitimate risk of going to trial – *i.e.*, people jumping to conclusions because of the serious charges.

### *iii) Evidence*

Lopez-Ozuna described evidence to Dr. Weller "as stuff they can use against you" which could harm your case."  (Dr. Weller's Psych. Eval. 2/13/2025 at 10.)  When asked how, he said, "They find something against you," but could not elaborate or provide more information.  (*Id.* at 11.)  He said that he did not know what evidence the prosecutors have against him or the strength of their case.  (*Id.*)  He knew that evidence "could help someone's case," but he could not provide examples or elaborate.  (*Id.* at 10–11.)

Lopez-Ozuna's description of evidence was a bit simplistic, but it is nevertheless accurate.  He knows that evidence can both harm or help his case.  His inability to provide examples of evidence is of no consequence for two reasons.  First, Lopez-Ozuna may have been able to provide examples of helpful and harmful evidence if Dr. Weller referenced the facts of his case detailed in law enforcement reports.  Second, what a layperson views as "evidence," may not actually be evidence or may not be admissible at a trial.  It is his attorney's job to determine what evidence is helpful or harmful to his case.

### *iv) Confidentiality*

When asked by Dr. Weller what confidentiality meant, he said, "It stays private." (Dr. Weller's Psych. Eval. 2/13/2025 at 11.)  But she noted that he could not provide a response as to what "stays private."  (*Id.*)

The Court finds that Lopez-Ozuna was spot-on in explaining the concept of confidentiality. There was simply no need to ask the follow-up question because immediately before asking him to explain confidentiality, Dr. Weller was asking him questions about how often he meets with his lawyers and when he last met with them. Thus, what he clearly believes will "stay[] private" are conversations between him and his attorneys.

### d. Role of Key Players in the Courtroom

#### i) Defense counsel

Lopez-Ozuna knew the name of his attorneys and said they are defense attorneys and not prosecutors. (Dr. Weller's Psych. Eval. 2/13/2025 at 11.) He told Dr. Weller that be believes that his attorneys are public defenders and are paid by the government. (*Id.*) He told both Dr. Johnson and Dr. Weller that his defense attorneys' job is to help him with his case; he trusts his attorneys; and he believes they are able to help him on his case. (*Id.*; (Doc. 78) at 3.)

When asked by Dr. Weller why it was important for a person to have a lawyer if they cannot afford one, he said: "So that they could speak to their lawyer first instead of telling the cops the wrong thing"; "they still need a lawyer for court." (Dr. Weller's Psych. Eval. 2/13/2025 at 6–7.) Dr. Weller noted that Lopez-Ozuna denied that he was concerned about his attorneys and denied disagreeing with them about how they are handling his case. (*Id.* at 11.) She also noted that he felt his attorneys were doing a good job on his case, but he could not provide ideas about what his attorneys should do to help his case. (*Id.*) Lopez-Ozuna also said that his attorneys have not yet asked him to do anything to help with his case. (*Id.*) He said he has not discussed legal strategy with his attorneys and did not know what plea he would enter. (*Id.*)

The Court believes that Lopez-Ozuna described the job of his attorneys as most defendants would – *i.e.*, to help with their case and maybe get charges dismissed or reduced to get a lower sentence. He also identified why it was important for a defendant to have a lawyer even if s/he cannot afford one. Lopez-Ozuna's comments that his attorneys have

not asked him to help out on his case or discussed legal strategy or a plea to enter are not surprising because his attorneys believe he is not competent. As a result, there is not much to discuss about those subject matters until the competency issue is resolved; and defense counsel did not proffer that they had done so. By contrast, Lopez-Ozuna told Dr. Johnson that he had been offered a plea agreement in the state case, which necessarily means that he has discussed the plea agreement with those attorneys.

### ii) Prosecutor

Lopez-Ozuna told Dr. Johnson that the prosecutor works for the government and will try to prove that he is guilty. ((Doc. 78) at 3.) He told Dr. Weller that he thinks that the prosecutor's job is to "try to get evidence against me" and "make me look bad." (Dr. Weller's Psych. Eval. 2/13/2025 at 9.) He knew that if a prosecutor asked him questions outside of the courtroom, he should not answer them. (*Id.* at 10.) When asked why, he said: "Cuz they could try to trick me with trick questions, they could use against me." (*Id.*)

Once again, Lopez-Ozuna's description of the prosecutor's job, even if simplistic, is accurate. As a result, the Court believes that Lopez-Ozuna understands both the role of a prosecutor and adversarial nature of the court proceedings.

### iii) The Jury

Lopez-Ozuna told Dr. Johnson that the jury is a group of people who sit on the side of the courtroom who listen to both sides presented and then decides whether a person is guilty or not guilty based on what is presented. ((Doc. 78) at 3–4.) When asked by Dr. Weller who in the courtroom decides guilt, he said, "The jury?" (Dr. Weller's Psych. Eval. 2/13/2025 at 10.) Based on these descriptions, the Court believes that Lopez-Ozuna has the requisite basic understanding of the role of the jury.

### iv) The Judge

Lopez-Ozuna told Dr. Johnson that a judge will decide his sentence if he pleads guilty or is found guilty. ((Doc. 78) at 4.) He also knew that a judge would decide guilt in a bench trial. (*Id.*) However, he told Dr. Weller that he did not know the difference between a bench trial and a jury trial. (Dr. Weller's Psych. Eval. 2/13/2025 at 10.) When

asked by Dr. Weller about the role of the judge, he said, "to sentence you?"  (*Id.*)  He later said that the job of a judge is to "decide."  (*Id.*)  When asked what the judge decides, he said "anything."  (*Id.*)  He knew that the judge has authority over him.  Based on these descriptions, the Court also finds that Lopez-Ozuna has the requisite basic understanding of the role of the judge.

*v) Witnesses*

Lopez-Ozuna told Dr. Johnson that a witness is someone who may have seen what happened.  ((Doc. 78) at 4.)  He also told Dr. Weller that a witness was "someone . . . that seen the crime happen," and added that a witness would testify in the courtroom about "what happened." (Dr. Weller's Psych. Eval. 2/13/2025 at 10.)  He told Dr. Weller that he knew a witness could help someone's case and also hurt someone's case by "telling everyone what happened[,]" but he could not provide examples or elaborate on how a witness could do either and denied that he could help his attorneys find witnesses to help his case.  (*Id.* at 10, 12.)  Lopez-Ozuna told Dr. Johnson that he would tell his attorney if he believed that a witness was lying.  ((Doc. 78) at 4.)  Similarly, he told Dr. Weller that if a witness says "something different than what happened . . . I would tell them when I'm sitting next to them." (Dr. Weller's Psych. Eval. 2/13/2025 at 12.)  He also told Dr. Weller that he knew he could ask his attorneys if he did not understand something a witness said in court.  (*Id.*)

The Court finds that Lopez-Ozuna has the requisite understanding of the role of a witness at a trial – *i.e.*, a person who testifies about what they saw when the crime was committed.  He has the insight that it is important to tell his attorneys if a witness is lying and he would do so.  He also knows that a witness's testimony can help or hurt someone's case.  Once again, Lopez-Ozuna may have been able to provide examples of how a witness can help or hurt his case if Dr. Weller focused on the facts of his case, rather than asking the question in a vacuum where he had no context to identify examples.

The Court concludes that Lopez-Ozuna has an understanding of the factual basis of the proceedings against him, his legal rights, and the key players in the criminal process.

1    Although his understanding may be more simplistic than other defendants, the Due Process

2    Clause only requires a minimal understanding of the proceedings and legal concepts.

3        2.    Ability to communicate with counsel in helping prepare a defense

4        Dr. Johnson explained that the two *Dusky* prongs overlap because a doctor is

5    looking at both a person's understanding of legal proceedings and their rights and the

6    ability to assist counsel throughout the entire evaluation.  (Hr'g Tr. 3/4/2025 (Doc. 113) at

7    54.)  Dr. Johnson assesses a person's knowledge of how the court process works and their

8    rights based on specific answers to questions.  (*Id.*)  By contrast, he assesses the ability to

9    work with counsel based on how a person works and interacts with the evaluator generally,

10   and specifically when discussing legal concepts.  (*Id.*)  For that reason, when asked by

11   defense counsel if he asked Lopez-Ozuna any questions about his ability to work with

12   counsel, he testified, "That is something that is more indirect throughout the evaluation

13   that one would assess. . . . I'm not sure how I would ask him how he can assist counsel

14   quite in that way."[12]  (*Id.* at 67.)

15       Dr. Johnson also explained that he has had defendants who understand the nature of

16   the proceedings and the criminal process but cannot assist in their defense.  (*Id.* at 112.)

17   But those situations commonly involve individuals who are psychotic at the time and their

18   psychosis is preventing them from working with their attorneys to prepare a defense.  (Hr'g

19   Tr. 3/4/2025 (Doc. 113) at 112.)  That scenario, however, does not apply to Lopez-Ozuna.

20   (*Id.*)  Dr. Johnson acknowledged that there are individuals whose cognitive impairments

21   are so severe that it is obvious that they cannot work with their attorneys.  (*Id.* at 117.)

22   However, a person like Lopez-Ozuna who has borderline intellectual function is generally

23   able to work with their attorney.  (*Id.*)

24       As discussed earlier, Dr. Weller's opinion is that Lopez-Ozuna is not able to assist

25   his attorneys because, based on her testing, she would expect that: he will not understand

26

27   _____

28   [12] The Court notes that defense counsel did not ask Dr. Weller if she asked Lopez-Ozuna
     questions about his ability to work with counsel.  Dr. Weller is likely of the same view as Dr.
     Johnson given that she did not mention such a question in her report or during her testimony.

a lot of what is being communicated" to him by his attorneys; he will have difficulty formulating verbal responses to counsel or will be slow in doing so; he will have greater difficulty in a stressful situation; he will have trouble sustaining attention during meetings and remembering what was discussed; he will have difficulty reading the discovery unsupervised; and he will not pick up on legal nuances. (*See* Hr'g Tr. 3/4/2025 (Doc. 113) at 179–86.)

The primary problem the Court has with Dr. Weller's opinion that Lopez-Ozuna cannot assist counsel in his defense is that there is little correlation between the neurological testing and Lopez-Ozuna's ability to work with counsel. The testing only addressed his general intellectual functioning in a vacuum; it did not address legal concepts or how he could apply those concepts when discussing his case with his attorneys. In fact, Lopez-Ozuna scored very well on the only test that questioned him on legal concepts.[13]

Dr. Weller testified about the many problems that she would "expect" Lopez-Ozuna to have in communicating with and assisting counsel based on her testing. That comment suggests that Lopez-Ozuna's low test scores became a self-fulfilling prophecy in that they necessarily meant to Dr. Weller that he cannot assist counsel. For example, in many instances (especially in later interviews), Dr. Weller did not probe further or push Lopez-Ozuna when he did not respond to a question or repeatedly responded by saying "I don't know[,]" shrugging his shoulders, or responding to her question with a question. Dr. Weller usually just dropped the subject matter being discussed, many times because Lopez-Ozuna seemed tired or fatigued. Because Dr. Weller almost always let Lopez-Ozuna off the hook when he did not respond to a question or responded (verbally or nonverbally) "I

---

[13] Lopez-Ozuna got 58 out of 61 true/false questions correct on the Inventory of Legal Knowledge test. He got one question wrong because he answered true to the question that the only two pleas a defendant can enter are guilty and not guilty. The Court does not even consider that a wrong answer since pleas of "no contest" and "guilty but insane" so rarely occur or are not known to many laypeople. Dr. Weller testified repeatedly that this test does not measure legal knowledge, it is a test for malingering or exaggerating their lack of legal knowledge. Although the Court accepts Dr. Weller at her word, it is worth noting that Lopez-Ozuna got many questions correct that many criminal defendants (or laypeople generally) may not.

don't know," it was likely a cue to him that either providing that response or not responding would end the discussion about a subject area. He may well have been motivated to do so because he was tired and fatigued, or as discussed earlier and below, exaggerating his memory problems.[14]

Dr. Johnson testified that he does not recall any "I don't know" answers, because he would have noted that response. As a result, the many "I don't know" answers to Dr. Weller's questions (other than the "why" questions) raise another concern that the defendant is feigning or exaggerating his memory issues. That concern is also supported by the fact that Lopez-Ozuna was more responsive to Dr. Weller's questions about legal concepts during the October 31, 2024 interview, and he became less responsive with each subsequent interview.

Defense counsel argue that the Court should give considerable weight or deference to their doubts about Lopez-Ozuna's ability to assist counsel in his defense. In support of their argument, the defense relies on *Marks v. Davis*, 106 F. 4th 941, 971 (9th Cr. 2024), where the Ninth Circuit's noted that defense counsel's opinion about a defendant's competency "are entitled to considerable weight because 'defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." (*Id.* at 106 F.4th at 971.)[15]

However, that court also noted that the among the substantial evidence of incompetency presented were specific and detailed facts provided by counsel about his

---

[14] It is worth noting that Dr. Weller admitted that Lopez-Ozuna's fatigue and the lingering pain from his injuries may have contributed to his lack of focus and attention, and as a result, lower test scores. She testified, however, that she has "no way of determining what percentage or what amount of variability in his test scores was accounted for by his fatigue." (Hr'g Tr. 3/4/2025 (Doc. 113) at 237.) at 232).

[15] Defense counsel also point to the Supreme Court's comment that "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." *Medina v. California*, 505 U.S. 437, 450. Because Supreme Court was dealing with an issue far different than in the case at hand -- whether a California statute that placed the burden of proof on the defendant to prove incompetence violates the Due Process Clause – that case does not require further discussion.

competency concerns. Specifically, the defendant's attorney testified at the competency hearing about why he believed the defendant was not competent; nevertheless, the defendant was ultimately found competent. The same attorney, who had been replaced by new counsel prior to trial, filed a detailed declaration in support of the defendant's state habeas petition asserting that he was incompetent to stand trial. The declaration stated that the defendant: (1) had refused to accept that it was his voice on the recordings; (2) believed the prosecution or someone switched photographs from exhibits admitted into evidence at the preliminary hearing; (3) was convinced that a witness had excluded him as the assailant in shooting, when in fact the witness had not seen the shooter; (4) was obsessed with discrepancies between eyewitnesses description of the suspect and the defendant's appearance; and (5) went completely off on incomprehensible tangents and was so out of touch with reality that he could not understand what was going on.[16] The Ninth Circuit ultimately affirmed the district court's denial of the federal habeas petition court's related to the competency issue. Like the district court, the Ninth Circuit found that there was a reasonable basis for the state court's rejection of the competency claim.

In this Court's view, the takeaway from *Marks* is that if defense counsel's doubts about their client's competence are to be given considerable weight in the competency analysis, then facts that support their doubts – like counsel's testimony and declaration in *Marks* – must be proffered in some form. Because defense counsel had not yet done so, the Court asked counsel at oral argument to articulate why they believe Lopez-Ozuna cannot assist counsel. Like Dr. Weller, counsel pointed to Lopez-Ozuna's cognitive

---

[16] The government seems to agree that defense counsel's concerns about a client's competency can be considered by the court in making a competency determination. However, the government cites to *United States v. Telles*, 18 F.4th 290, 299-300 (9th Cir. 2021), for the proposition that once a court determines that a competency hearing is warranted, the relevant medical opinions and competency evaluations should be given more weight than defense counsel's concerns about their client's competency. (Hr'g Tr. 3/11/2025 (Doc. 118) at 288.) *Telles* involved the district court's failure to hold a competency hearing notwithstanding defense counsel's concern about their client's competency. As a result, it is not clear how the government pulls the proposition noted above from *Telles*. Neither that court nor the *Marks* court identified the weight to be given to counsel's concerns about competency in relation to the medical evidence and expert opinions about competency.

1    deficits and memory issues which prevent him from focusing, concentrating, and

2    remembering and understanding legal concepts.

3        The Court followed-up by asking counsel to proffer examples of comprehension

4    issues or communication difficulties that have resulted from his lack of focus,

5    concentration, and memory.  Counsel stated that they could not do so because they would

6    be violating the attorney-client privilege and/or duty of confidentiality.[17]  Counsel never

7    made clear how they would be revealing confidences or privileged communications by

8    discussing legal concepts (*e.g.*, the right to testify or go to trial) that Lopez-Ozuna cannot

9    understand, and explaining how that shortcoming has impacted his ability to assist counsel.

10    Nevertheless, the Court asked counsel if they could provide general or vague examples of

11    memory issues on legal concepts or key players in the courtroom that did not reveal

12    confidences or privileged information.

13        The only example provided was that Lopez-Ozuna talked about the facts of his case

14    with Dr. Johnson, even though "he would have been instructed not to do that, and, yet, he

15    did.  So I think that that is an example of inability to follow instructions and inability to

16    understand consequences and recommendations given by counsel."  (Hr'g Tr. 3/11/2025

17    (Doc. 118) at 284.)  However, counsel's choice of words has left it unclear about whether

18    counsel specifically told Lopez-Ozuna not to talk to Dr. Johnson about the facts of his case.

19    Because Dr. Johnson told Lopez-Ozuna that he was conducting a court-ordered evaluation,

20    it was reasonable for Lopez-Ozuna to believe that he was required to answer (or try to

21    answer) all questions.  Moreover, defense counsel would certainly concede that, much to

22    their chagrin, many competent defendants (as well as intelligent and/or sophisticated

23    defendants) talk about the facts of their case with other people even though advised and

24    cautioned by counsel not to do so.

25

26

27        _____

28        [17] The Court notes that the attorney-client privilege and duty of confidentiality with respect
         competency related matters have arguably been waived because counsel has put their client's
         mental state in issue.

- 92 -

For the reasons discussed below, the Court agrees with Dr. Johnson that Lopez-Ozuna is able to rationally assist his attorney and help prepare his defense based on his understanding of the legal proceedings and the key players, his ability to describe in detail the events that led to the offenses, and his ability to cooperate with questioning and communicate in a logical and reasonable manner. The following facts support the conclusion that Lopez-Ozuna can assist his attorneys in his defense and engage in legal strategy.

First, Lopez-Ozuna told both Dr. Johnson and Dr. Weller that his defense attorney's job is to help him; that he trusts his attorneys, and he believes they are able to help him on his case. Both Dr. Johnson and Dr. Weller are of the view that Lopez-Ozuna's ability to assist in his defense benefits from the good rapport he has with his attorneys, the trust he has in them, his belief that his attorneys know what they are doing and working to help him with his case, and his willingness to follow their advice. Thus, there is a not a concern that his ability to assist his attorneys in preparing his defense would be compromised by distrust or uncooperativeness.

Second, Dr. Weller testified that Lopez-Ozuna's ability to assist in his defense benefits from his understanding of the charges against him and the seriousness of the charges. She also testified that Lopez-Ozuna knowing that he could face life in prison if found guilty at trial is important for assisting in his defense. Finally, she testified that Lopez-Ozuna knowing that a plea bargain could result in less prison time is important for assisting in his defense.

Third, Lopez-Ozuna said he did not know if he could receive a fair trial because the seriousness of the charges may cause people to jump to conclusions. That comment shows that Lopez-Ozuna has more insight than most defendants about the risk of going to trial. Additionally, he said that he would listen to and follow the advice of his attorneys. These comments, in conjunction with his knowing that a plea bargain could result in less prison time, show that Lopez-Ozuna is able to make a calculated and reasoned decision, based on the advice of his attorneys (who he trusts), about whether to go to trial or plead guilty.

Fourth, Lopez-Ozuna told Dr. Johnson and Dr. Weller that he would tell his attorney if he believed that a witness was lying. He also told Dr. Weller that he knew he could ask his attorneys if he did not understand something a witness said in court. Both doctors believe that Lopez-Ozuna's willingness to "speak up" and let his attorneys know if a witness is lying is evidence of his ability to assist in his defense.

Fifth, Dr. Weller testified that Lopez-Ozuna knowing that he has the right not to testify at his trial is an example of legal strategy. When asked by Dr. Weller if he would want to testify, Lopez-Ozuna said "probably no." When asked why, he said he felt "a little bit worried." When asked why, he said "If I say something wrong." Lopez-Ozuna's recognition of the risks associated with testifying show both an ability to assist in his defense and engage in legal strategy. In fact, an argument can be made that Lopez-Ozuna recognizes the dangers inherent in testifying more than defendants who, even after being advised by counsel that they should not testify, decide to ignore that advice because they think they can talk the jury out of a guilty verdict.

Sixth, Dr. Weller testified that Lopez-Ozuna's statement that he would never want to represent himself is trial strategy.

Finally, both doctors agreed that Lopez-Ozuna knows how to behave in the courtroom – *e.g.*, remain quiet, be respectful, not interpret anyone, and only speak when asked a question. As a result, there is no concern about him not being able to assist his attorneys at trial because he is disrespectful, disruptive, uncooperative, acting up, or misbehaving.[18]

---

[18] As Dr. Johnson pointed out, accommodations can be made for Lopez-Ozuna at trial, such as more frequent breaks both because of fatigue and so he can confer with his attorneys. And defense counsel may need to repeat and rephrase questions and simplify legal concepts during their meetings. Additionally, defense counsel would be well advised to speak with Lopez-Ozuna about taking ADHD medication to help with his attention and focus. Dr. Weller testified that ADHD medication "can indirectly help with some kinds of memory because attention is the gatekeeper for memory." (Hr'g Tr. 3/4/2025 (Doc. 113) at 230.) Frankly, it is surprising that defense counsel has not already had this conversation with Lopez-Ozuna.

Based on these facts, the Court concludes that Lopez-Ozuna has demonstrated the ability to assist his counsel in his own defense. Specifically, he has the sufficient present ability to consult with his attorneys with a reasonable degree of rational understanding of the proceedings against him.

**IV.    CONCLUSION**

Dr. Weller is requiring Lopez-Ozuna to have a mastery of legal knowledge that is not required for a defendant to be competent to stand trial. As a result, her opinion strays into the kind and degree of competence that the Supreme Court has held that the Due Process Clause does not require. By contrast, Dr. Johnson's opinion is consistent with the test for competency set forth in *Dusky*, which has been held to be minimal and have "modest aim"; that is, a rational factual understanding of the proceedings and the present ability to consult with his attorney with a reasonable degree of rational understanding. Because that test has been met, the Court concludes that the government has proven by a preponderance of the evidence that Lopez-Ozuna is competent to stand trial.

**V.    RECOMMENDATION**

For the foregoing reasons, the Magistrate Judge recommends that the District Judge find that the defendant is competent to stand trial.

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal Rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. No reply shall be filed unless leave is granted from the District Court. If objections are filed, the parties should use the following case number: **CR-24-06035-TUC-AMM**.

…

…

…

…

…

1         Failure to file timely objections to any factual or legal determination of the

2    Magistrate Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right

3    of review.

4

5                   Dated this 18th day of April, 2025.

6

7

8    _____

9    Eric J. Markovich
     United States Magistrate Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28